**Tirey Glen SMITH, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 12–99–00066–CR.**

Court of Appeals of Texas, Tyler.

April 3, 2002.

Discretionary Review Refused Sept. 18, 2002.

---

Kenneth Nash, for appellant.

Panel consisted of DAVIS, C.J., WORTHEN, J., and GRIFFITH, J.

LEONARD DAVIS, Chief Justice.

This case is on remand from the court of criminal appeals. On original submission, Appellant Tirey Glen Smith ("Appellant") appealed his conviction for aggravated sexual assault of a child on two issues, one of which was the alleged denial of his constitutional right to confrontation of the complaining witness. *Smith v. State*, 88

S.W.3d 643 (Tex.App.-Tyler 2000). We overruled both issues and affirmed the conviction. Appellant filed a petition for discretionary review, which was granted, and the court of criminal appeals remanded the case for reconsideration of the confrontation issue in light of *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). *Smith v. State*, 61 S.W.3d 409 (Tex.Crim.App.2001). We affirm.

## BACKGROUND

A.G., the complaining witness, was the five-year-old daughter of Melinda Moore, Appellant's live-in girlfriend. In February of 1997, A.G. made a general allegation of sexual abuse to her grandmother, Shirley Gober ("Gober"). On February 20, 1997, in response to A.G.'s statements, Gober took A.G. to her family physician, Robert Thompkins, M.D. ("Thompkins"). During their visit, A.G. told Thompkins she had been living with her mother and that "her mother's boyfriend, Tirey, had sexed her." She also said "he had done that in the front and the back and that it was painful and caused her to bleed." She further told Thompkins that Appellant had "sexed her more than one time" and that "he had put his boy part in the front and back and that this had caused a lot of pain and bleeding." Thompkins performed a cursory medical examination, but found no bruises or signs of obvious trauma. He then made a referral to Child Protective Services.

The next day, Lea Proudfoot ("Proudfoot"), a CPS investigator, interviewed A.G. regarding the alleged sexual abuse and videotaped the interview. During the interview, A.G. described an incident in which she, Appellant, and her mother were on her mother's bed. Appellant was wearing "underwear pants" and told her to "strip off," which she understood as meaning "to take off your clothes." According to A.G., Appellant removed his underwear and instructed her to lie on top of him. With his hands on her hips, Appellant held her over his mouth, started licking her on the "back of the butt," and asked her if it felt good. He then put his "weenie" in her while her mother helped with her hands. Appellant asked A.G. if that felt good, and she told him that it did not and that she wanted to get down. Both her mother and Appellant told her to "hold on" and that it would be over in a minute. She also told Proudfoot that Appellant had put his "weenie" inside her, but he put it in the middle, which was the wrong place, and she started bleeding. She stated that her mother had wiped her off with a towel and put salve on her. Using anatomical drawings, A.G. identified the male and female genitals as the body parts she was describing and identified the female genital area as what hurt inside. She stated that Appellant had done the same things to her several times.

On February 26, 1997, Jaime Coffman, M.D. ("Coffman"), a pediatrician, examined A.G. for signs of sexual abuse, but the results were inconclusive. Prior to the examination, Coffman obtained the following history from Gober, outside A.G.'s presence, regarding A.G.'s initial statement about the alleged abuse:

> It was bedtime. She was hungry and got a weenie out of the refrigerator. She asked papa what it was called and asked if it was a man's weenie. She said she saw her daddy's, Tirey Smith's. She said he was sexing her momma, and he sexed her, too. She said her momma helped him put it in, and she bled, and her momma got a towel and cleaned her up and put a salve on it.

Coffman then talked with A.G., who related the following details outside Gober's presence:

Ti put his weenie in my front private. One time he missed, and it went in the middle. He did it a bunch of times. My mommy helped him put his weenie in. In Dallas, I saw Mommy and Ti do it. Mommy would make me take my clothes off. One time the stuff that's in Ti's weenie was on a towel, and mommy made me lick it. It was yucky. When he put his weenie in, it hurt. I bled. Not every time. There was a lot of blood.

Approximately one month after Coffman examined A.G., Appellant was indicted for aggravated sexual assault.

Prior to trial, the State filed a motion to have A.G. declared unavailable and to introduce the videotaped interview conducted by Proudfoot as evidence at trial. Appellant objected, and the court held a hearing on the motion on March 8, 1999. The State called A.G. as a witness at the hearing, but she had difficulty responding to questions in the courtroom. She then testified in the judge's chambers, and Appellant observed her by closed circuit television. His attorney was present in both settings, but did not have an opportunity to question A.G. in the courtroom. After checking with Appellant, his attorney declined the opportunity to question A.G. in the judge's chambers. In the courtroom as well as in the judge's chambers, A.G. exhibited various types of avoidance behavior and was unable to answer questions relating to the details of the occurrence.

Before ruling on the State's motion, the court also viewed the videotaped interview and heard testimony from Lisa Wallace ("Wallace"), A.G.'s counselor. Wallace described A.G.'s emotional condition and stated her concerns about the resulting psychological and physical consequences if A.G. was required to testify at trial. At the conclusion of the hearing, the court ruled that A.G. was unavailable to testify in the courtroom and that the videotaped interview was admissible for all purposes. Appellant's counsel objected, contending that the court's rulings violated Appellant's "constitutional right to confrontation." The court overruled the objection and allowed the attorneys to submit written interrogatories for presentation to A.G. as provided in article 38.071, section (2)(b) of the Texas Code of Criminal Procedure.[1] The day after the hearing, Proudfoot conducted another videotaped interview of A.G. for the purpose of propounding the questions submitted by the attorneys.

The case was tried to a jury beginning on March 9, 1999, which was slightly more

1. Article 38.071 applies only if the court determines that a child younger than thirteen years of age would be unavailable to testify in the presence of the defendant about any of the offenses listed in the statute, including aggravated sexual assault. TEX.CODE CRIM. PROC. ANN. art. 38.071, § 1 (Vernon Supp.2002). Article 38.071 further provides as follows:

. . . .

Sec. 2. (a) The recording of an oral statement of the child made before the indictment is returned or the complaint has been filed is admissible into evidence if the court makes a determination that the
Footnote continued.
factual issues of identity or actual occurrence were fully and fairly inquired into in a detached manner by a neutral individual experienced in child abuse cases that seeks to find the truth of the matter.

(b) If a recording is made under Subsection (a) of this section and after an indictment is returned or a complaint has been filed, by motion of the attorney representing the state or the attorney representing the defendant and on the approval of the court, both attorneys may propound interrogatories that shall be presented by the same neutral individual who made the initial inquiries, if possible, and recorded under the same or similar circumstances of the original recording with the time and date of the inquiry clearly indicated in the recording.

. . . .

TEX.CODE CRIM. PROC. ANN. art. 38.071, §§ 2(a), (b) (Vernon Supp.2002).

than two years after the first videotaped interview. A.G. did not testify, and a videotape of each interview was admitted in evidence. The jury found Appellant guilty of aggravated sexual assault and assessed punishment at imprisonment for life.

### RIGHT TO CONFRONTATION AND HEARSAY

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. The central purpose of the Confrontation Clause is to ensure the reliability of the evidence against an accused through rigorous testing in an adversary proceeding before the trier of fact. *Maryland v. Craig,* 497 U.S. 836, 845, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666 (1990). The elements of confrontation guaranteed by the Sixth Amendment include the physical presence of the witness, an oath, cross-examination, and observation of the witness's demeanor by the trier of fact. *Id.,* 497 U.S. at 846, 110 S.Ct. at 3163; *Mattox v. United States,* 156 U.S. 237, 242–43, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895). Confrontation enhances the accuracy of the factfinding process because (1) a witness who testifies under oath will be impressed with the seriousness of the matter and the possibility of a penalty for perjury; (2) cross-examination, which has been described as "the greatest legal engine ever invented for the discovery of truth," is available for testing the credibility of the witness; and (3) the demeanor of the witness can be considered by the jury in assessing credibility. *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970) (citations omitted). Thus, the literal right to "confront" witnesses at trial forms the core of the values preserved by the Confrontation Clause. *Lee v. Illinois,* 476 U.S. 530, 540, 106 S.Ct.

2056, 2062, 90 L.Ed.2d 514 (1986); *Green,* 399 U.S. at 157–58, 90 S.Ct. at 1934–35.

The hearsay rules provide additional assurance that evidence introduced at trial will be reliable. *See Green,* 399 U.S. at 155, 90 S.Ct. at 1933. Hearsay is an out-of-court assertion offered in evidence to prove the truth of the matter asserted and as a general rule is inadmissible. FED.R.EVID. 801(c), 802; TEX.R. EVID. 801(d), 802. Out-of-court statements are traditionally excluded because they are not made under the usual testimonial conditions—oath, personal appearance at trial, and cross-examination—and therefore lack the conventional indicia of reliability. *Chambers v. Mississippi,* 410 U.S. 284, 298, 93 S.Ct. 1038, 1047, 35 L.Ed.2d 297 (1973). By excluding hearsay, the general rule preserves the right of an accused to confront adverse witnesses in open court, which is consistent with the values of the Confrontation Clause. 2 McCORMICK ON EVIDENCE § 252, at 122 (John W. Strong ed., West Group 5th ed.1999).

The rules of evidence, however, include a number of exceptions to the general hearsay rule, which allow the admission of specific categories of hearsay. FED. R.EVID. 803, 804; TEX.R. CIV. EVID. 803, 804. The rationale for those exceptions is that, over the course of time, experience has shown that certain types of out-of-court statements are generally reliable and trustworthy. FED.R.EVID. 803, 804 commentary to rules; TEX.R. CIV. EVID. 803, 804 commentary to rules. In other words, the exceptions presuppose that certain circumstances under which hearsay statements are made tend to assure reliability and thereby compensate for the absence of the oath and opportunity for cross-examination. *Chambers,* 410 U.S. at 298–99, 93 S.Ct. at 1047. In addition, statutes such

as article 38.071 permit the admission of hearsay for policy or practical reasons.[2]

When hearsay is admitted into evidence pursuant to an exception, an accused has no opportunity to confront and cross-examine a declarant who does not testify. In that instance, the conflict between the hearsay rules and the guarantees of the Confrontation Clause becomes apparent. If a confrontation challenge is raised, a court must decide whether, under the particular circumstances of the case, the Clause permits denying an accused the usual right to force the declarant to submit to cross-examination. *Lilly v. Virginia*, 527 U.S. 116, 124, 119 S.Ct. 1887, 1894, 144 L.Ed.2d 117 (1999).

In addressing alleged conflicts between the Confrontation Clause and the hearsay rules, the Supreme Court has emphasized that the absence of proper confrontation at trial calls into question the ultimate integrity of the factfinding process. *Chambers*, 410 U.S. at 295, 93 S.Ct. at 1046 (citations omitted). However, the Court has also rejected a literal interpretation of the Clause, which would bar the use of any out-of-court statements when the declarant does not testify, and determined instead that the right to confrontation "must occasionally give way to considerations of public policy and the necessities of the case." *Mattox*, 156 U.S. at 243, 15 S.Ct. at 340. Thus, the Clause does not prohibit all hearsay evidence, *e.g., id.*, 156 U.S. at 243–44, 15 S.Ct. at 340, and the right to confrontation is not absolute. *Chambers*, 410 U.S. at 295, 93 S.Ct. at 1046.

Although the Confrontation Clause does not require the exclusion of all hearsay, it also does not incorporate all exceptions to the hearsay rules. *E.g., Dutton v. Evans*, 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27 L.Ed.2d 213 (1970); *Green*, 399 U.S. at 155–56, 90 S.Ct. at 1933–34. However, the Court has declined to "map out a theory that would determine the validity of all ... hearsay exceptions" when evaluated in light of confrontation values. Instead, each hearsay exception presented for review has been carefully scrutinized to determine whether the admission of hearsay statements pursuant to the exception impermissibly denies an accused the right to confront and cross-examine witnesses. *Green*, 399 U.S. at 162, 90 S.Ct. at 1937. In every case, the resolution of the issue has turned on whether the circumstances under which the statement was made provide sufficient assurance that the statement is reliable. *See, e.g., Mattox*, 156 U.S. at 243–44, 15 S.Ct. at 340.

After years of reconciling the Confrontation Clause and the hearsay rules, the Court formulated a general approach for determining when incriminating statements admissible under a hearsay exception are sufficiently reliable to satisfy the requirements of the Confrontation Clause. *Ohio v. Roberts*, 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980). The approach outlined in *Roberts* comprises two aspects. The first requires a demonstration by the prosecution that the declarant whose statement it wishes to use against the defendant is unavailable to tes-

---

**2.** The purpose of the present version of article 38.071 is to "establish procedures for the taking of testimony of child complainants in certain criminal prosecutions, while preserving the constitutional rights of defendants." Further, the legislature sought to create "a sufficiently flexible system that properly pro-

tects the rights of defendants while reducing the deleterious effects of the criminal justice system on certain child sex crime victims." Act approved August 4, 1987, 70th Leg., 2d C.S., ch. 55, § 2, 1987 Tex. Gen. Laws 180, 185.

tify in court.[3] *Id.*, 448 U.S. at 65, 100 S.Ct. at 2538. The second aspect requires a showing that the statement to be used bears certain "indicia of reliability" that justify placing the statement before a jury and provide a satisfactory basis for evaluating the truth of the statement. *Id.*, 448 U.S. at 65–66, 100 S.Ct. at 2539 (citations omitted). Under the *Roberts* approach, the necessary reliability can be inferred, without more, where the evidence falls within a "firmly rooted" hearsay exception. If the hearsay exception cannot be considered "firmly rooted," the evidence is presumed inadmissible and must be excluded, absent a showing of "particularized guarantees of trustworthiness." *Id.*, 448 U.S. at 66, 100 S.Ct. at 2539. In *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), the Court expounded upon the second aspect of the *Roberts* inquiry.

### Idaho v. Wright

In *Wright*, the respondent and Robert L. Giles ("Giles") were convicted of two counts of lewd conduct with a minor under sixteen years of age. The respondent was the mother of both alleged victims, who were female. One of the girls was 5 1/2 years old and the other was 2 1/2 years old at the time the crimes were charged. Giles was the father of the younger child. After the allegations of abuse surfaced, the younger child made statements to Dr. Jambura ("Jambura"), a pediatrician, in response to questions he asked about the alleged abuse. At the joint trial of the respondent and Giles, the trial court concluded that the child was incapable of communicating to the jury and allowed Jambura to testify concerning the child's statements. The testimony was admitted pursuant to Idaho's residual hearsay exception. *Wright*, 497 U.S. at 808–11, 110 S.Ct. at 3143–44.

Jambura testified that he performed a medical examination of the younger child, and found conditions suggesting sexual abuse. He also recounted the details of his interview with the child, which was not videotaped. In his testimony, Jambura related the questions he asked during the interview, which were leading and very specific as he inquired about the details of the alleged abuse and the identity of the abuser. In response to those questions, the child admitted that some sexual touching had occurred and that "daddy" was the perpetrator. However, Jambura testified that when he tried to elicit more details, the child's attitude changed and she would not state exactly what kind of touching took place or how it happened. He further testified that during the interview, the child volunteered without any prompting that "daddy does do this with me, but he does it a lot more with my sister than with me." *Id.*, 497 U.S. at 810–11, 110 S.Ct. at 3143–44.

The respondent and Giles were both convicted by a jury and sentenced to twenty years of imprisonment. On appeal, the Idaho Supreme Court reversed the respondent's conviction, agreeing with her contention that the admission of Jambura's testimony about the child's statements violated her rights under the Confrontation Clause.[4] The court held that a Confronta-

---

3. The Court noted, however, that a demonstration of unavailability is not always required. *Roberts*, 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7. In a later case, the Court stated that consideration of unavailability is necessary only when the challenged out-of-court statements were made in a prior judicial proceeding. *United States v. Inadi*, 475 U.S. 387, 394, 106 S.Ct. 1121, 1125, 89 L.Ed.2d 390 (1986).

4. In Giles's appeal, he challenged the admissibility of the pediatrician's testimony under the residual hearsay exception, but did not raise

tion Clause violation had occurred because the child's statements did not fall within a traditional hearsay exception and were elicited in an interview that lacked procedural safeguards. Specifically, the court found that the interview was inadequate because the questions and answers were not recorded on videotape, "blatantly leading questions" were used in the interrogation, and the interrogation was performed by someone with a preconceived idea of what the child should be disclosing. *Id.,* 497 U.S. at 812–813, 110 S.Ct. at 3145. The State sought review by the United States Supreme Court, and the Court granted certiorari. As in other cases in which an objection to hearsay was based on an alleged confrontation violation, the Court resolved the question by assessing the reliability of the challenged statement.

Before addressing the issue raised by the respondent, the Court reaffirmed the *Roberts* approach to reconciling the Confrontation Clause and the hearsay rules. *Id.,* 497 U.S. at 815–16, 110 S.Ct. at 3147 (citations omitted). According to *Roberts,* hearsay offered into evidence as an exception to the general rule must either fall within a "firmly rooted" hearsay exception or the statement must be supported by "particularized guarantees of trustworthiness." Otherwise, the statement is inadmissible. *Id.,* 497 U.S. at 816–17, 110 S.Ct. at 3147–48; *Roberts,* 448 U.S. at 66, 100 S.Ct. at 2538. Therefore, in compliance with *Roberts,* the Court first addressed whether Idaho's residual hearsay exception was a firmly rooted hearsay exception.

At the outset, the Court noted that a firmly rooted hearsay exception is considered reliable because of the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of statements falling under the exception. *Id.,* 497 U.S. at 817, 110 S.Ct. at 3147

(citations omitted). By contrast, the residual exception accommodates *ad hoc* instances in which statements not otherwise falling within a recognized hearsay exception are nevertheless held to be sufficiently reliable to be admissible at trial. *Id.* Therefore, statements admitted under the residual exception, almost by definition, do not share the same "tradition of reliability" that characterizes a firmly rooted hearsay exception. *Id.,* 497 U.S. at 817, 110 S.Ct. at 3148. Consequently, the residual exception was not "firmly rooted," and Jambura's testimony about the child's statements was presumptively inadmissible according to *Roberts. Id.,* 497 U.S. at 817–18, 110 S.Ct. at 3147–48.

Having concluded that the residual exception was not "firmly rooted," the Court then inquired, as mandated by *Roberts,* whether the circumstances under which the statements were made provided other indicia of reliability sufficient to overcome the presumption of inadmissibility. *Id,* 497 U.S. at 826, 110 S.Ct. at 3152. As a preliminary matter, however, the Court established additional guidelines to govern its evaluation of the statement's reliability.

The Court first determined, that the challenged statement must be in itself inherently reliable and could not be judged by reference to other evidence introduced at trial. The existence of sufficient corroborating evidence is therefore irrelevant when considering whether sufficient particularized guarantees of trustworthiness establish the statement's reliability. *Id.,* 497 U.S. at 819, 110 S.Ct. at 3148. In addition, the assessment of reliability must be based on the totality of the circumstances surrounding the making of the statement and whether those circumstances render the declarant particularly worth of belief. *Id.* Further, evidence

the confrontation issue. The Idaho Supreme

Court affirmed his conviction.

possessing particularized guarantees of trustworthiness must be at least as reliable as evidence admitted under a firmly rooted hearsay exception. *Id.*, 497 U.S. at 821, 110 S.Ct. at 3149. In short, the presumption of inadmissibility can be overcome only if the declarant's truthfulness is so clear from the surrounding circumstances that cross-examination would be of marginal utility. *Id.*, 497 U.S. at 820, 110 S.Ct. at 3149.

■■■ With those guidelines established, the Court then identified several factors relevant to whether hearsay statements by a child witness in child sexual abuse cases are reliable. Those factors, which would provide the basis for assessing the reliability of the statement before it, include (1) the spontaneity and consistent repetition of the statement, (2) the mental state of the declarant, (3) the use of terminology unexpected of a child of similar age, and (4) the lack of a motive to fabricate. *Id.*, 497 U.S. at 821–22, 110 S.Ct. at 3150 (citations omitted). After viewing the totality of the circumstances in light of the relevant factors, the Court found "no special reason for supposing that the incriminating statements were particularly trustworthy." *Id.*, 497 U.S. at 826, 110 S.Ct. at 3152. Therefore, the Court held that the State had not overcome the presumption of inadmissibility and affirmed the reversal of the respondent's conviction.

By granting certiorari in *Wright*, the Court addressed for the first time the admissibility of a statement made by a child who is an alleged victim of sexual abuse, but does not testify at trial. In addition, the Court's analysis provides invaluable guidance for other courts who must resolve the same issue. Although the statements admitted in the case at bar were made under circumstances much different from those addressed in *Wright*, the dispositive issue in the two cases is the

same. The resolution of Appellant's challenge to the admissibility of A.G.'s statements depends on whether the statements are supported by particularized guarantees of trustworthiness. To make that determination, we conduct an analysis similar to the one conducted in *Wright*.

## ADMISSIBILITY OF THE VIDEOTAPES

The videotapes of A.G.'s statements were introduced in evidence under article 38.071, section 2 of the Texas Code of Criminal Procedure. Appellant argues that the introduction of the videotapes in lieu of presenting A.G. to testify at trial violates the Confrontation Clause and that the videotapes were therefore inadmissible. To determine the merits of Appellant's contention, we must first decide whether article 38.071 is a firmly rooted hearsay exception. If we find to the contrary, we must then determine whether there are other sufficient indicia of reliability to establish that A.G.'s statements are characterized by the requisite degree of trustworthiness necessary for admissibility.

### Firmly Rooted Hearsay Exception

■■■ The underlying purpose of the Confrontation Clause is to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence. *Roberts*, 448 U.S. at 65, 100 S.Ct. at 2539. Therefore, to survive a Confrontation Clause challenge, any hearsay admitted as evidence must be marked with such trustworthiness that "there is no material departure from the reason of the general rule." *Id.* (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 107, 54 S.Ct. 330, 333, 78 L.Ed. 674 (1934)). Hearsay exceptions that are identified as "firmly rooted" typify that standard.

■■■ As stated in *Wright*, all firmly rooted hearsay exceptions share a tradi-

tion of reliability, which develops as a result of longstanding judicial and legislative experience in assessing the trustworthiness of the out-of-court statements falling within those exceptions. *Wright*, 497 U.S. at 817, 110 S.Ct. at 3147–48. A residual hearsay exception, such as the one considered in *Wright*, operates in *ad hoc* situations in which a reliable hearsay statement is inadmissible under other exceptions. Therefore, the circumstances under which the statements are made can vary as widely as the content of the statements considered. As a result, the residual hearsay exception does not create a single category of hearsay that lends itself to evaluation, and a tradition of reliability for statements admitted under that exception cannot be established.

By contrast, article 38.071 is not a residual hearsay exception, but is a legislative enactment that addresses the admissibility of hearsay statements made by a child. However, we are convinced that, like the residual hearsay exception, article 38.071 also lacks a tradition of reliability.

The Texas Legislature enacted article 38.071 in 1983 to preserve the statement of a child sexual abuse victim, provide a procedural means for the statement to be admissible in evidence later, and collaterally create a procedure that accommodates the absence of the victim from the courtroom. *Long v. State*, 742 S.W.2d 302, 315 (Tex.Crim.App.1987). In 1987, the Texas Court of Criminal Appeals declared that section 2 of the statute unconstitutionally deprived an accused of the right of confrontation. *Long*, 742 S.W.2d at 323. Immediately following *Long*, the legislature made significant revisions to the statute, which were effective in 1987.

The present version of the statute applies only to a hearing or proceeding in which a child younger than thirteen years of age is unavailable to testify in the pres-

ence of the defendant about an offense listed in the statute. TEX.CODE CRIM. PROC. ANN. art. 38.071, § 1. Appellant was charged with aggravated sexual assault, which is one of the offenses listed in section 1. Section 8 includes a number of factors to be considered by the trial court in determining unavailability. TEX.CODE CRIM. PROC. ANN. art. 38.071, § 8 (Vernon Supp.2002).

When a child is unavailable to testify, a recording of the child's oral statement made before the indictment is returned, such as A.G.'s first statement in this case, is admissible if the court determines that the factual issues of identity or actual occurrence were fully and fairly inquired into in a detached manner by a neutral individual who is experienced in child abuse cases and seeks to find the truth of the matter. TEX.CODE CRIM. PROC. ANN. art. 38.071, § 2 (Vernon Supp.2002). In addition, the court must also find substantial satisfaction of the requirements set forth in section 5, which primarily pertain to the procedural safeguards surrounding the interview. TEX.CODE CRIM. PROC. ANN. art. 38.071, § 5 (Vernon Supp.2002).

The hearsay exception and the procedures created by article 38.071 as described above have existed for less than two decades. In considering whether article 38.071 is a firmly rooted hearsay exception, we are not required to assess the soundness of the statute's underlying purpose or the merits of any of its provisions. We must simply determine whether the statute has existed for a sufficient period of time to permit an accurate judicial and legislative assessment of the reliability of statements admitted under its provisions.

In considering the matter, we have conducted an extensive review of Supreme Court cases and find no instance in which a hearsay exception of such recent origin

has been identified as "firmly rooted." *See, e.g., Lilly,* 527 U.S. at 127, 119 S.Ct. at 1895 (voluntary statements against penal interest carry a "distinguished heritage" confirming admissibility in this country as far back as 1846); *White v. Illinois,* 502 U.S. 346, 356 n. 8, 112 S.Ct. 736, 743 n. 8, 116 L.Ed.2d 848 (1992) (the firmly rooted exception permitting admission of spontaneous declarations is at least two centuries old); *Bourjaily v. United States,* 483 U.S. 171, 183, 107 S.Ct. 2775, 2783, 97 L.Ed.2d 144 (1987) (the exception for co-conspirators' statements was first established over a century and a half ago); *Mattox,* 156 U.S. at 243, 15 S.Ct. at 340 (dying declarations have been treated as competent testimony from "time immemorial").

We have further reviewed cases from states having a statutory child hearsay exception similar to article 38.071 and find that all courts addressing the issue decided with little or no analysis that such statutes cannot be considered firmly rooted hearsay exceptions because of their recent enactment. *E.g., McGriff v. State,* 781 A.2d 534, 538 (Del.2001) (Delaware "tender years" statute); *State v. Rohrich,* 132 Wash.2d 472, 480, 939 P.2d 697, 702 (Wash. 1997) (Washington statutory child hearsay exception); *People v. Bridgewater,* 259 Ill. App.3d 344, 348, 197 Ill.Dec. 557, 631 N.E.2d 779, 782 (1994) (Illinois statutory child hearsay exception); *Bockting v. State,* 109 Nev. 103, 109, 847 P.2d 1364, 1367 (Nev.1993) (Nevada statutory child hearsay exception); *State v. Jankiewicz,* 831 S.W.2d 195, 198 (Mo.1992); *State v. Myatt,* 237 Kan. 17, 26, 697 P.2d 836, 844 (Kan.1985) (Kansas statutory child hearsay exception).

The cases cited above confirm our own conclusion that a hearsay exception of such short duration cannot be considered firmly rooted, and we find no authority to the contrary. We therefore hold that article 38.071 has no "tradition of reliability" because of its recent enactment and is not a firmly rooted hearsay exception.[5] As a result, A.G.'s statements are presumptively inadmissible under the holding in *Wright.* We now determine whether the State rebutted the presumption of inadmissibility by showing that A.G.'s statements possess sufficient particularized guarantees of trustworthiness to establish their reliability.

### Particularized Guarantees of Trustworthiness

As previously discussed, the Court in *Wright* identified several factors to be applied in assessing the reliability of a statement made by an alleged child victim of sexual abuse. Those factors focus on the declarant and include (1) the spontaneity and consistent repetition of the statement, (2) the mental state of the declarant, (3) the use of terminology unexpected of a child of similar age, and (4) the lack of a motive to fabricate. *Id.,* 497 U.S. at 821–22, 110 S.Ct. at 3150 (citations omitted). The court of criminal appeals has identified several additional factors for our consideration that focus on the procedure followed in conducting the interview. Those factors include (1) the giving of an age-appropriate oath before the statement is made, (2) the presence of the defendant during the interview, (3) the presence of the child's parent during the interview, (4) the relationship of the declarant to the interviewer, (5) the length of time between the child's first outcry and the making of the statement, (6) the quality of the tape,

**5.** By our holding, we do not mean to imply that longevity is the sole determinant of reliability.

and (7) the method by which the interview is conducted, including whether the questions are leading, whether the child is given a break when needed, and whether written interrogatories from the defendant are submitted and answered. *Smith*, 61 S.W.3d at 412–13 (citations omitted).

Both the Supreme Court and the court of criminal appeals emphasized that the factors identified are not exclusive and that courts have considerable leeway in their consideration of the appropriate factors. *Wright*, 497 U.S. at 822, 110 S.Ct. at 3150; *Smith*, 61 S.W.3d at 413. We interpret those comments to mean that we may consider any additional factors we deem relevant and accord such weight to each factor considered as is appropriate under the facts of the case. With that in mind, we apply the factors identified by both courts to the totality of the circumstances surrounding the making of A.G.'s statements, without reference to any corroborating evidence, to determine whether A.G.'s truthfulness is so clear from the surrounding circumstances that traditional cross-examination would be of marginal utility. *Wright*, 497 U.S. at 819–20, 110 S.Ct. at 3148–49.

1. *The spontaneity and consistency of the statements.* A.G. made statements to Gober, Thompkins, Proudfoot, and Coffman about the alleged abuse. The record indicates that her statement to Gober was spontaneous and not the result of questioning or comments by Gober or any other person. Although the exact date A.G. made her statement to Gober cannot be determined from the record, Gober testified that A.G. came to live with her on December 28, 1996 and that A.G.'s statement to her regarding the alleged abuse was approximately a month and a half to two months later in February of 1997. As a result of A.G.'s statement, Gober took A.G. to see Thompkins on February 20,

1997. During that visit, A.G. made her statement to Thompkins. One day later, A.G. had her interview with Proudfoot. Approximately one week after her interview with Proudfoot, A.G. made her statement to Coffman.

In Proudfoot's videotaped interview, she initially asked A.G. questions about neutral topics such as her home, her school, and her family members. When asked her mother's name, A.G. volunteered that she did not want to live with her mother because her mother had done some bad things. Proudfoot then began to elicit the details of the alleged abuse through an extensive series of questions.

As A.G. provided specific information about the alleged incidents, Proudfoot sought additional details, such as where A.G. was when the incidents she described were happening, what she felt, and what she saw. When A.G. gave a general description of the alleged acts, Proudfoot pressed her for more specific details. She also made certain that A.G. explained the terms she used to describe the alleged acts and provided anatomical drawings to assist A.G. in clarifying her assertions. Proudfoot's questions were almost exclusively nonleading, and she conducted the entire interview in question and answer format. At no time was A.G. allowed to simply narrate facts. A.G. responded to Proudfoot's questions with little prodding and in several instances volunteered more information than was necessary to answer the question.

Although A.G. described the alleged abuse in more detail when interviewed by Proudfoot, the statements she made to Gober, Thompkins, and Coffman were consistent with her statements to Proudfoot. In the second interview Proudfoot conducted two years later, A.G. confirmed that she remembered what happened and that she was not fabricating the story because

someone had encouraged her to do so. She also answered questions such as who was present during the alleged incidents and where those incidents occurred. Although she answered most of the questions propounded in the second interview, she exhibited avoidance behavior when asked to relate the specific details of what happened and stated that the questions were "too hard." As to those questions she answered, all of her responses were entirely consistent with the details she had related to Proudfoot two years earlier.

In reviewing the various statements made by A.G., we find no contradictions nor do we find any inconsistent answers to Proudfoot's questions in either interview. Although in the second interview A.G. avoided discussing specific details of the alleged sexual acts, that does not diminish the credibility of her prior statement to Proudfoot when considered in context. Wallace testified at the pretrial hearing that A.G.'s emotional instability had increased as the trial date approached and that she had become more agitated, emotional, and withdrawn. A.G.'s avoidance behavior and her demeanor as depicted on the videotape are consistent with Wallace's observations about her emotional state and strongly convey the message that she simply could not relate the details of the alleged incidents one more time. As a result, we conclude that her failure to answer all of the questions in the second interview reflects her increasing emotional distress and does not imply that she avoided answering because she was untruthful in her prior statements. We further conclude that A.G.'s spontaneity in her first interview with Proudfoot and the consistency of all of the statements she made indicate that she made truthful responses in both interviews conducted by Proudfoot.

2. *Mental state of the declarant.* The record indicates that A.G. had been living with Gober at least a month and a half when she made her general statement to Gober regarding the alleged abuse. In her interview with Proudfoot, A.G. described incidents that allegedly occurred while she was living with her mother. Therefore, her statements were not made while she was acting under the immediate stress of the situation. *Cf. Morgan v. Foretich,* 846 F.2d 941, 948 (4th Cir.1988) (child declarant who was nearly hysterical in the moments immediately preceding most statements was clearly acting under the stress of the situation). Consequently, A.G. appeared relaxed and was cooperative in the first interview with Proudfoot.

Because A.G.'s statements in that interview were made at least a month and half after the alleged abuse, we recognize that her candor with Proudfoot, a stranger, may indicate that she had been coached. *Webb v. Lewis,* 44 F.3d 1387, 1392 (9th Cir.1994) (a precise statement to a stranger "invites reflection on what had prepared [the child] to be so candid"). On the other hand, her candor may indicate that she was simply a talkative five-year-old who did not realize the gravity of the conduct she described. *Morgan,* 846 F.2d. at 947 (children do not necessarily understand sexual contact by adults to be shocking, especially when the adult is a parental figure from whom the child desires love and affection).

We find the second alternative more likely for several reasons. First, A.G. described the alleged incidents of sexual abuse in response to nonleading questions rather than in narrative form. In that format, we doubt that a five-year-old could have been so thoroughly rehearsed that she could field questions from an experienced investigator without contradicting herself or being unable to provide the details Proudfoot requested. Moreover, the record contains no indication that A.G. had

been subjected to any prior interrogations that could have prepared her for Proudfoot's first interview. Further, Appellant was a parental figure, and it is likely that A.G. would not understand sexual contact by him to be prohibited, especially where her mother participated in the alleged incidents of abuse and also engaged in sexual acts with Appellant that A.G. observed.

By the time of the second interview, A.G. had undergone extensive counseling and had participated in several interviews to prepare her in the event she was required to testify at trial. Instead of enhancing her confidence and her candor, however, her experiences after the alleged events had the opposite effect, and A.G. became more reluctant to repeat her prior statements.

When A.G. entered the room for the second interview, she told Proudfoot that she did not want to be in front of the camera. Apart from her comments about the camera, however, she seemed relaxed until Proudfoot began to ask questions about the alleged abuse. When those questions arose, she became withdrawn and avoided relating specific details of the alleged incidents.[6] Thus, it was apparent that A.G.'s mental state changed significantly after the first interview and that by the date of the second interview she understood the seriousness of the conduct she described. Consequently, she avoided discussing the allegations about which she had previously been so candid. The sharp contrast in A.G.'s behavior before and after two years of discussing her allegations with counselors and those assisting in preparing the case for trial supports our conclusion that her former candor was not the result of repeated interviews or rehearsals. Because we consider A.G.'s candor to be the product of her innocence and not prior interviews or rehearsals, we conclude that her mental state at the time of the first interview with Proudfoot supports the truthfulness of her statements. Although her original candor had diminished somewhat by the second interview, her answers remained consistent with her prior statements, which also supports a conclusion that she was truthful in both interviews with Proudfoot.

3. *Use of terminology unexpected of a child of similar age.* In reviewing the record, we note that A.G.'s answers to Proudfoot's questions revealed a detailed knowledge of sexual acts. Although A.G. described the acts in terminology typical of a young child, her knowledge of the acts themselves far exceeded what would be expected for her years. While A.G. admitted that she had observed the sexual acts of her mother and Appellant, we do not believe she could have acquired a knowledge of the conduct she described in her statements through an occasional chance observation of adult sexual acts. The startling contrast between the age level of A.G.'s terminology and her knowledge of sexual conduct has a "ring of verity," *Morgan*, 846 F.2d at 948 (citation omitted), and supports the reliability of A.G.'s statements.

4. *Lack of a motive to fabricate.* During the first interview, A.G. referred to Appellant as her "daddy" and obviously considered him a member of her family, although she admitted she did not know his last name. In the second interview,

---

**6.** The changes we observed in the second videotape are consistent with Wallace's testimony that as the trial date approached, she observed the following changes in A.G.: (1) she became more agitated, emotional, and withdrawn; (2) she had a recurrence of a motor tic that developed at some point after her first interview with Proudfoot; (3) her symptoms of Tourette's syndrome, which was diagnosed between the first and second videotaped interviews, became worse; and (4) she had difficulty communicating.

A.G. acknowledged that Appellant was not her "daddy" and that she did not know her real father or even her real father's last name. However, her comments were made with sadness rather than animosity. In our review of the interviews with Proudfoot, we do not find that A.G. made any statement which indicated she had ill feelings or animosity toward Appellant. The absence of any apparent motive to fabricate the story she related to Proudfoot indicates that A.G.'s statements were truthful.

5. *The giving of an age-appropriate oath.* In Proudfoot's first interview, she cautioned A.G. about the necessity for her to tell the truth. A.G. responded by describing the penalty she incurred when she told a "lie" and stating that she could avoid the penalty by telling the truth. It was in that interview that A.G. made the inculpatory statements that were most damaging to Appellant. In the second interview, Proudfoot did not mention to A.G. that she should respond to the questions truthfully. However, we do not weigh that omission heavily under the facts of this case because A.G.'s responses to the questions she answered were consistent with her responses in the prior interview. In addition, the trial court had questioned A.G. a day earlier in the courtroom, and A.G. had again indicated that she understood truth and the penalty for telling a "lie." Consequently, we conclude that A.G.'s acknowledgment, both in the first interview and in the courtroom, that she understood truth and the penalty for failing to tell the truth supports the reliability of her statement to Proudfoot.

6. *Presence of Appellant at the interview.* Appellant was not present at either interview conducted by Proudfoot. The first interview was conducted prior to Appellant's indictment, and the second was the day after the hearing on the State's motion to declare A.G. unavailable. At the hearing on the State's motion, Appellant had an opportunity for a face-to-face confrontation with A.G. In the courtroom, A.G. was unable to relate the details of the alleged incidents. The judge questioned her in chambers with the same result. The attorneys for the State and Appellant were present in both settings. Appellant's attorney did not have an opportunity to question A.G. in the courtroom and after consulting with Appellant, he declined the opportunity offered by the judge to question A.G. in chambers. Appellant was present in the courtroom and observed the proceedings held in chambers by closed circuit television. At the interview with Proudfoot the following day, A.G. was still unable to relate the specific details of the alleged sexual abuse. Because A.G. was unable to describe the alleged conduct in any of the three settings, regardless of whether Appellant was present, we do not heavily weigh Appellant's absence at the second interview.

As to the first interview, we recognize that the presence of an accused is a deterrent to fabrication and that "[a] witness may feel quite differently when he has to repeat his story looking at the man whom he will harm greatly by distorting or mistaking the facts." *Coy v. Iowa,* 487 U.S. 1012, 1019, 108 S.Ct. 2798, 2802, 101 L.Ed.2d 857 (1988) (citations omitted). However, we also recognize that, with the exception of testimony in a prior proceeding, most hearsay statements are made outside the presence of the accused. Thus, we cannot conclude that Appellant's absence at the first interview is dispositive. Although Appellant's absence is one factor that can raise a question about the reliability of A.G.'s statements, *Schaal v. Gammon,* 233 F.3d 1103, 1108 (8th Cir.2000), we do not weigh it heavily in this case because of the other indicia of reliability that are evident from the totality of the

circumstances surrounding the challenged statements.

**7. *Presence of A.G.'s parent during the interview.*** Neither A.G.'s mother nor any other member of her family was present at either interview. As a result, A.G.'s statements were made in an atmosphere that was free from the influence of any family member who might have ill feelings toward Appellant or who might interfere with the neutrality of the interview process. Accordingly, that factor supports the truthfulness of A.G.'s statements.

**8. *Relationship of the declarant to the interviewer.*** The record does not indicate that A.G. had met Proudfoot before the first interview. Therefore, A.G. had not previously established a relationship with Proudfoot that would cause her to be concerned about whether her answers pleased Proudfoot or conformed to Proudfoot's expectations, either expressed or assumed. Further, the record does not indicate that A.G. had an opportunity to discuss the alleged incidents with Proudfoot prior to the videotaped interview. The absence of any prior relationship or communication between A.G. and Proudfoot supports the truthfulness of A.G.'s statements.

**9. *Length of time between A.G.'s first outcry and the making of the statement.*** We have assumed, based upon our review of the record, that A.G.'s initial statement to Gober occurred no earlier than a month and a half after A.G. came to live with Gober and no later than one day prior to the appointment. Therefore, it appears that A.G.'s statement to Gober was no earlier than a week prior to Proudfoot's first interview.

We acknowledge that the concern with the passage of time is the intervening period between A.G.'s first outcry and her first interview with Proudfoot, which provided sufficient time for A.G. to rehearse the story she would relate to anyone who interviewed her. However, the record indicates that after her initial outcry, A.G. repeated her allegations to only one individual, Thompkins, prior to her first interview with Proudfoot. We recognize, however, that the existence of practice sessions or prompting from one who might have ill feelings toward Appellant would not likely be apparent from the record. With that in mind, we have carefully reviewed the videotapes in an attempt to detect the consistent repetition of words or any other indicators of rehearsal, but have found none. Further, we find nothing in the record that suggests such a scenario. *Cf. Webb*, 44 F.3d at 1392 (for almost a month preceding the interview, the child declarant had been interviewed repeatedly concerning the alleged sexual abuse). The relatively short interval between A.G.'s initial outcry and her first interview with Proudfoot, along with the absence of repeated interviews concerning the details of the alleged abuse, supports the truthfulness of A.G.'s statements.

**10. *The quality of the tape.*** The quality of both videotapes was excellent, the sound was clear, and the demeanor and mannerisms of both A.G. and Proudfoot could be readily observed at all times. The identity of the interviewer and the location, date, and time of the interviews were clearly stated on each tape. The environment in which the interviews were conducted could be easily assessed. Therefore, we conclude that the quality of the videotapes supports the reliability of A.G.'s statements.

**11. *The submission of written interrogatories.*** Proudfoot's first interview with A.G. was conducted before Appellant's indictment. Pursuant to Section 2(b) of article 38.071, either the attorney representing the State or Appellant's attorney could have sought court approval

after the indictment was handed down for both attorneys to propound written interrogatories to A.G. TEX.CODE CRIM. PROC. ANN. art. 38.071, § 2(b). Neither attorney filed such a request prior to the pretrial hearing, which was approximately two years after Proudfoot's first interview. After determining that A.G. was unavailable to testify, the trial court extended an opportunity for the attorneys to prepare written interrogatories, and they did so. The interrogatories were reviewed in open court, and each attorney was allowed to present objections to the other's proposed questions. Proudfoot's second interview, which occurred the day after the pretrial hearing, was for the sole purpose of propounding those interrogatories.

■■■■ The Confrontation Clause clearly reflects a preference for face-to-face confrontation at trial, which includes cross-examination. *See, e.g., Craig,* 497 U.S. at 849, 110 S.Ct. at 3165; *Roberts,* 448 U.S. at 63, 100 S.Ct. at 2537. As we stated in our prior opinion in this case, "[t]here can be little doubt that as a general proposition in-person oral cross-examination is preferred to the rather sterile alternative of another questioner asking an attorney's written questions." We also recognized that written questions lack spontaneity, the opportunity for "give and take," and immediate follow-up that are the essence of traditional cross-examination. *Smith,* 88 S.W.3d at 651. Although confrontation, and specifically cross-examination, is crucial to the factfinding process, face-to-face confrontation at trial is not an incontrovertible right. *See, e.g., Lilly,* 527 U.S. at 127, 119 S.Ct. at 1895; *White,* 502 U.S. at 356 n. 8, 112 S.Ct. at 743 n. 8.

In *Bourjaily, White,* and other Confrontation Clause cases, hearsay was admitted without cross-examination or any attempt to provide a meaningful alternative. *E.g.,*

*White,* 502 U.S. at 356–57, 112 S.Ct. at 743 (statements of a child declarant who did not testify at trial were admitted as spontaneous declarations and statements made in the course of receiving medical care); *Bourjaily,* 483 U.S. at 182, 107 S.Ct. at 2782 (statement of a co-conspirator who exercised his right not to testify was admitted to establish the existence of the conspiracy). Consequently, we do not consider A.G.'s unavailability for traditional cross-examination at trial fatal to the reliability of the challenged statements nor do we agree with Appellant that the submission of written interrogatories did not test the reliability of A.G.'s statements.

As previously discussed, A.G. was present and called to testify at the pretrial hearing, but was unable to relate the details of the alleged sexual abuse in the courtroom or in the judge's chambers. Based upon A.G.'s inability to testify at that time, either in the courtroom or in chambers, we have no reason to believe that the result would have been different if she had been presented to testify at trial. As we stated in our prior opinion, the extenuating circumstances present in this case—A.G.'s age, immaturity, and fragile emotional state—rendered the "preferred" method of cross-examination unattainable. *Smith,* 88 S.W.3d at 651.

Although A.G. did not answer all of the questions propounded to her in the second interview, she was certainly more responsive than she had been in the courtroom and in the judge's chambers. In addition, her responses to the questions she answered were consistent with the statements she made to Proudfoot two years earlier. Because A.G. was able to respond to some of the questions propounded through written interrogatories, Appellant had an opportunity to test the reliability of her responses to Proudfoot in the first

interview on those same points. Consequently, the written interrogatories proved more effective in this case than traditional cross-examination because of A.G.'s inability to testify in a courtroom setting. Therefore, the submission of the written interrogatories and the fact that A.G.'s answers were consistent with her prior responses to Proudfoot support the reliability of her statements.

12. *The manner in which the interview was conducted.* In the first interview, which was approximately forty minutes long, Proudfoot's questions were almost exclusively nonleading. At one point, A.G. wanted to play with the games that were on the table when the interview began, but did not protest when Proudfoot told her that she could play after they finished talking. A.G. also mentioned being tired once and became distracted at least one other time during the interview. Each time A.G.'s attention lapsed, Proudfoot reminded her that they needed to continue, and A.G. again became attentive. She did not ask for a break and did not resist Proudfoot's efforts to keep her on track. Her demeanor and her behavior did not indicate that she was actually tired, but that she had the limited attention span of a typical five-year-old. Near the conclusion of the interview, Proudfoot left A.G. alone in the room for a few minutes with the videocamera running. During that time, A.G. played and talked cheerfully to herself about how nice and how pretty she thought Proudfoot was. Proudfoot then returned and concluded the interview.

The second interview was much shorter in duration than the first and was conducted for the purpose of propounding written interrogatories submitted by the attorneys in the case as permitted by article 38.071. Proudfoot asked the questions as submitted without explanation or comment. A.G. answered all of the questions prepared by the attorneys except those that related to the specific details of the incidents she had described in the first interview. In both interviews, Proudfoot's demeanor, mannerisms, and vocal intonations were neutral and did not suggest answers or reveal her reaction to A.G.'s responses. Based on our review of the videotapes, we find that both interviews were conducted in an objective manner, which supports the truthfulness of A.G.'s statements.

### CONCLUSION

Based upon our application of the relevant factors to the totality of the circumstances surrounding A.G.'s statements to Proudfoot, we conclude that the statements possess "particularized guarantees of trustworthiness" that support the reliability, and therefore the admissibility, of the statements at trial. Specifically, we hold that for the reasons set forth in the foregoing analysis, the following factors establish that A.G.'s statements are sufficiently reliable that traditional cross-examination would be of marginal utility: (1) the spontaneity and consistency of the statements; (2) A.G.'s candor during the first interview with Proudfoot; (3) a knowledge of sexual acts that is unusual for a five-year-old child; (4) the apparent lack of a motive to fabricate; (5) Proudfoot's discussion about telling the truth in the first interview and A.G.'s acknowledgment that she understood truth and the penalty for telling a "lie"; (6) the absence of any of A.G.'s family members at the interviews; (7) the absence of any relationship with Proudfoot that would have influenced A.G.'s responses; (8) the lapse of no more than a week between A.G.'s first outcry and the interview with Proudfoot, coupled with the absence of any indication that her statements to Proudfoot were the result of any prior manipulation or

prompting; (9) Proudfoot's minimal use of leading questions; (10) the quality of the videotapes; and (11) Appellant's opportunity to submit written interrogatories.

Proudfoot's failure to caution A.G. to tell the truth in the second interview is the only circumstance that supports a contrary conclusion for the second videotape. Because the factors that support the reliability of A.G.'s statements outweigh those that do not, we conclude that Appellant's absence at both interviews does not negatively reflect on the reliability of A.G.'s statements. Based upon our review of the record and our assessment of the reliability of the challenged statements, we hold that the trial court did not err in admitting the videotaped interviews of A.G. at the trial on the merits and overrule the sole issue addressed in this opinion.

The judgment of the trial court is *affirmed.*