MARVIN HOWARD BOCKTING, Appellant, v.
THE STATE OF NEVADA, Respondent.

No. 19524

March 8, 1993                    847 P.2d 1364

*Morgan D. Harris,* Public Defender, and *Mark S. Blaskey,*
Deputy Public Defender, Clark County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex
Bell,* District Attorney, *James Tufteland,* Deputy District Attorney, and *John Lukens,* Deputy District Attorney, Clark County,
for Respondent.

## OPINION

*Per Curiam:*

Appellant Marvin Howard Bockting was arrested and charged with four counts of sexual assault on his six-year-old stepdaughter: counts I and II, forcing vaginal and anal intercourse upon the child; count III, compelling the victim to perform fellatio upon him; and count IV, forcing the child to submit to cunnilingus. Bockting was convicted on Counts I, II and III.

Bockting appealed to this court, contending that his constitutional right to confront adverse witnesses had been denied. More specifically, Bockting insisted that he was deprived of his right to cross-examine his stepdaughter because unreliable hearsay statements attributed to her were admitted into evidence pursuant to NRS 51.385. Concluding that Bockting's arguments were meritless, we ordered the appeal dismissed.

Bockting successfully petitioned the United States Supreme Court for a writ of certiorari. After vacating this court's order dismissing appeal, the Supreme Court remanded Bockting's appeal to us for further consideration in light of Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139 (1990).

### FACTS

Bockting and the child victim's mother, Laura, were married in early 1984. Eventually the couple, Laura's daughter, and a child born to Bockting and Laura, made their way to Las Vegas, where they obtained one-bedroom accommodations in a hotel. Bockting worked as a handyman at various jobs during the day and took care of the children at night while Laura attended business college.

On Saturday evening, January 16, 1987, while Bockting was away, his stepdaughter woke up frightened and sobbing. Despite prior threats by Bockting that he would "beat her butt" and that "mom would make dad leave," the stepdaughter eventually told

her mother about the sexual attacks she had suffered at the hands of Bockting.[1]

Laura asked her daughter when these activities occurred and the child said it happened a lot and that the last occurrence was while the child's mother was in school. Because the disclosures were made after Laura had been in school for only one week, the last incident must have transpired within that week.

On Tuesday, January 19, 1987, Laura took her daughter to the hospital, where Dr. Stacy Rivers, a gynecologist and obstetrician, examined the child under a general anesthetic. The examination by Dr. Rivers revealed a tear in the rectal sphincter and a wide opening in the hymenal ring.

Detective Charles Zinovitch attempted to question the visibly distraught child at the hospital, but because she was so upset, her only response was that someone had hurt her. Two days later, however, Detective Zinovitch was able to effectively communicate with the victim at his office. There, in a room specially designed to enable children to feel comfortable and at ease while being interviewed, the child gave the detective the same information she had conveyed to her mother. Detective Zinovitch asked the girl various questions to determine the consistency and authenticity of her statements.[2] The child's third recitation of the events occurred when she demonstrated the incidents with the use of anatomically correct dolls. Her depiction of the acts reflected "correct" positioning of the dolls, representing Bockting and herself during the various sexual acts, as well as correct placement of the doll's genitalia.[3] Subsequent to the interview, Bockting was arrested and charged with four counts of sexual assault.

---

[1]After being reassured by her mother, the young victim explained that Bockting had repeatedly put his "pee-pee in her pee-pee," that he put his "pee-pee in her butt," that he made her "suck his pee-pee like a sucker," and that "he put his chin on her pee-pee."

[2]When asked what was meant by her "pee-pee," the child responded by pointing between her legs. Similarly, when asked where a man's "pee-pee" was, she said it was between his legs. When discussing in child's terms the subject of fellatio, she descriptively stated that "white bubbly stuff came out of Bockting's pee-pee" and went into her mouth.

[3]Near the outset of the interview, Detective Zinovitch told the child that he might show her some dolls, but made no mention of the nature of the dolls. After the child had been able to describe to the detective what had happened to her, and the detective had thus heard all that he felt was necessary for a complete interview, the child asked if she could then see the dolls. In response, the detective produced the anatomically correct dolls, and the child was able to select the adult male doll and the "little girl" doll, and thereafter demonstrate to the detective through use of the two dolls what Bockting had done to her.

At the preliminary hearing, the prosecutor questioned the child concerning the incidents with Bockting. She was able to describe the surroundings, but stated that her pants were never removed and that she could not remember how Bockting touched her. She testified that she remembered talking to her mother and Detective Zinovitch, but could not remember what she told them. The judge asked Laura to accompany her daughter on the stand in an effort to enable the child to respond to questions. The effort proved futile, however, and the judge declared the child unavailable as a witness.

At trial, a hearing was held outside the presence of the jury where the six-year-old child was called to the stand and was uncommunicative when requested to take the oath. Efforts to persuade her to cooperate were of no avail and the judge, at the request of the prosecutor, declared the child unavailable for purposes of testifying. The prosecutor then attempted to have the child's hearsay statements to her mother and Detective Zinovitch admitted pursuant to NRS 51.385. The prosecutor had earlier supplied the defendant with the statutorily required notice of the State's intention to have the hearsay statements introduced at trial.

At the hearing mandated by NRS 51.385(1)(a), the victim's mother and Detective Zinovitch testified concerning the child's statements to them and the circumstances under which the statements were made. The court admitted the hearsay statements—as well as the victim's inconsistent statements made at the preliminary hearing—based upon the terminology, rationality, plausibility and consistency of the statements made to the mother and the detective.

## DISCUSSION

When this court first reviewed Bockting's appeal challenging the admissibility of the victim's hearsay statements to her mother and the investigating officer, we concluded from the record that the district court did not err in ruling that the child victim was unavailable as a witness and that the hearsay evidence was reliable. We therefore dismissed Bockting's appeal as meritless. Upon remand from the United States Supreme Court, we have reconsidered our prior ruling in light of Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139 (1990), and are convinced that Bockting's convictions must again be affirmed.

The single issue before us concerns the delicate balance between the State's right at trial to introduce an unavailable[4] child

---

[4]Although NRS 51.385 does not require the unavailability of the hearsay declarant as a prerequisite to the admissibility of the declarant's statements,

victim's hearsay statements and a defendant's right of confrontation under the Sixth Amendment to the Federal Constitution. Directly implicated in our analysis is NRS 51.385, the Nevada statute providing the basis for the hearsay exception invoked by the State, and the decision of the United States Supreme Court in *Idaho v. Wright.*

## THE CONSTITUTIONALITY OF NRS 51.385

NRS 51.385, in its entirety, provides:

> 51.385 Admissibility; notice of unavailability or inability of child to testify.
>
> 1. In addition to any other provision for admissibility made by statute or rule of court, a statement made by a child under the age of 10 years describing any act of sexual conduct performed with or on the child is admissible in a criminal proceeding regarding that sexual conduct if the:
>
> (a) Court finds, in a hearing out of the presence of the jury, that the time, content and circumstances of the statement provide sufficient circumstantial guarantees of trustworthiness; and
>
> (b) Child either testifies at the proceeding or is unavailable or unable to testify.
>
> 2. If the child is unavailable or unable to testify, written notice must be given to the defendant at least 10 days before the trial of the prosecution's intention to offer the statement in evidence.

The statute, enacted in 1985, was designed to address mounting societal concerns over what is generally perceived to be the rapidly growing menace of child sexual abuse. Usually, the younger the child, the greater the difficulty in achieving criminal accountability because of the sequestered setting in which the

---

we are satisfied on this record that the trial judge correctly determined that the child was unavailable as a witness. The record reveals, as described by the prosecutor, that the child "froze" and would not even stand or communicate to take the oath. Moreover, defense counsel did not contest the district court's ruling concerning the child's unavailability as a witness.

We therefore conclude that it is unnecessary to presently decide whether unavailability is a prerequisite to the admissibility of out-of-court statements by alleged child-victim declarants where the statements do not fall within firmly rooted hearsay exceptions. We note, however, that as a general proposition, it appears that the trend in both the state and federal courts is to not make admissibility dependent upon unavailability. Furthermore, in the context of firmly rooted hearsay exceptions, the United States Supreme Court recently held that the confrontation clause of the Sixth Amendment does not require either the production of the declarant at trial or a determination by the trial court that the declarant is unavailable. White v. Illinois, ...... U.S. ......, 112 S.Ct. 736 (1992).

crime is usually committed, and the limited ability of very young victims to communicate the nature and extent of their travails. Sexual crimes involving children of tender years thus strain the capacity and flexibility of the criminal justice system to sensitively—and constitutionally—accommodate effective prosecution.

Fortunately, it has been determined that the Confrontation Clause does not require that a defendant be given the absolute right to confront and cross-examine adverse witnesses. Thus, in *Wright,* the Court observed that "[w]e reaffirmed only recently that '[w]hile a literal interpretation of the Confrontation Clause could bar the use of any out-of-court statements when the declarant is unavailable, this Court has rejected that view as "unintended and too extreme."'" *Wright,* 497 U.S. at 814, 110 S.Ct. at 3145 (quoting both Bourjaily v. United States, 483 U.S. 171, 182 (1987), and Ohio v. Roberts, 448 U.S. 56, 63 (1980)); *see also* Maryland v. Craig, 497 U.S. 836 (1990) (where necessary, Confrontation Clause permits the admission of hearsay statements despite inability of defendant to confront declarant at trial).

Having thus concluded long ago that the Confrontation Clause does not invariably require the right to confront, the Supreme Court more recently announced two criteria for the admissibility of hearsay statements that will satisfy Sixth Amendment constraints where the declarant is unavailable for cross-examination. First, the Confrontation Clause usually requires the prosecution to demonstrate that the declarant is unavailable. Second, upon a showing of unavailability, the hearsay statement may be admitted if: (1) the statement satisfies the indicia of a "firmly rooted" hearsay exception; or (2) the statement reflects "particularized guarantees of trustworthiness." Ohio v. Roberts, 448 U.S. 56, 66 (1980).[5]

---

[5]In the recent case of White v. Illinois, ...... U.S. ......, 112 S.Ct. 736 (1992), the Court reaffirmed its earlier clarification of *Roberts* as enunciated in United States v. Inadi, 475 U.S. 387 (1986) ("*Roberts* must be read consistently with the question it answered, the authority it cited, and its own facts"), and concluded that "*Roberts* stands for the proposition that unavailability analysis is a necessary part of the Confrontation Clause inquiry only when the challenged out-of-court statements were made in the course of a prior judicial proceeding." *White,* ...... U.S. at ......, 112 S.Ct. at 741. As noted in footnote 4, *supra,* however, the question in *White* concerned whether it was necessary for the prosecution to produce the hearsay declarant at trial or the trial court to find the declarant unavailable as a predicate to the admissibility of out-of-court statements that fell within a firmly rooted hearsay exception.

In the instant case, the child's out-of-court statements are not within the category of a firmly rooted exception. We have elected not to decide whether a determination of unavailability is necessary where, as here, the out-of-court statements are admitted under the general hearsay exception founded upon guarantees of trustworthiness, as we have concluded that the child victim was, in fact, unavailable to testify at trial.

Facially, NRS 51.385 satisfies the *Roberts* criteria for admissibility despite the unavailability of the declarant and the resultant lack of opportunity to confront. We recognize that the hearsay exception created by the statute is not "firmly rooted" in the law of evidence. However, it does require a finding validated by a special hearing that "the time, content and circumstances of the statement provide sufficient circumstantial *guarantees of trustworthiness.*" NRS 51.385(1)(a) (emphasis added). The statutory language is designed, by reference to "time, content and circumstances," to provide *particularized* guarantees of a statement's trustworthiness. We therefore conclude that NRS 51.385 is constitutional on its face.[6]

## THE CONSTITUTIONALITY OF NRS 51.385 AS APPLIED

The application of the standard provided in *Roberts* was a primary focus of *Idaho v. Wright*. The *Wright* court determined that the Constitution does not impose a fixed set of procedural prerequisites to the admission of hearsay attributable to children. *Wright*, 497 U.S. at 818, 110 S.Ct. at 3148. Nevertheless, the Court adverted to several non-exclusive factors that may be significant in determining the reliability of hearsay statements referable to children in child sexual abuse cases. The factors identified by the Court included: (1) spontaneity and consistency in repetition; (2) declarant's mental state; (3) use of unexpected terminology by child of a given age; and (4) absence of motive to fabricate. Disavowing mechanical tests for determining particularized guarantees of trustworthiness, the Court declared that "the unifying principle is that these factors relate to whether the child declarant was particularly likely to be telling the truth when the statement was made." *Wright*, 497 U.S. at 822, 110 S.Ct. at 3150.

Although NRS 51.385 is not the codification of a firmly rooted hearsay exception, the statute does provide a proper forum for the evaluation and determination of the trustworthiness of child hearsay outside the presence of the jury. In such a setting, reliability may be more vigorously contested and more accurately discerned. In any event, with justifiable deference to the "unifying principle," our review now focuses on the facts of the instant case measured against the guidelines enunciated by the *Wright* court.

First, the circumstances under which the child victim initially revealed the incidents upon which the criminal charges were based generate an intuitive sense of trustworthiness. During the

---

[6]Courts in other jurisdictions have upheld similar statutes against constitutional attack. *See* State v. Bellotti, 383 N.W.2d 308 (Minn.Ct.App. 1986); State v. Myatt, 697 P.2d 836 (Kan. 1985); State v. Ryan, 691 P.2d 197 (Wash. 1984).

night, the child awoke from her sleep distressed and sobbing, and sought solace from her mother. The visibly upset six-year-old, after receiving assurances from her mother, provided the details of what had been happening to her. It strains credulity to conclude, under the conditions described, that the child's mentation would conjure up the parade of horrors she related about her stepfather. Moreover, the child's outpouring to her mother reflected a natural spontaneity indicative of truth.

The young victim's second recitation of Bockting's criminal behavior occurred during her interview with Detective Zinovitch in the latter's office. There, the girl's restatement of her travails was consistent with the details she had previously told to her mother.

The child's third consistent description of the events came when, of her own volition, she asked for dolls, and received the anatomically correct dolls. With the dolls, she demonstrated the various positions involved in the commission of the crimes. Again, the child's explanations and demonstrations with the dolls were sufficiently spontaneous to inspire confidence in their reliability. *See generally* D.A.H. v. G.A.H., 371 N.W.2d 1 (Minn. Ct.App. 1985) (child's statements to psychologist admitted, statements were spontaneous even with the passage of time). The girl's two verbal descriptions and the demonstrations and explanations connected with the dolls indicate consistent repetition in her out-of-court statements that adds an element of trustworthiness. *See* J. Myers, Child Witness Law and Practice § 5.37, at 367 (1987). Moreover, we were pleased to see that the veteran detective conducted the recorded interview with the child in a manner that was not suggestive, leading, or indicative of a predetermined resolve to produce evidence of child abuse.

The language used by the victim in describing what her stepfather had done to her was consistent with that expected of a six-year-old child. During her explanations of the sexual attacks, the child used such child-like terms and descriptions as "pee-pee," "butt," and "sucking on his pee-pee like a sucker" until "white bubbly stuff came out" and went into her mouth. She also described and demonstrated through the use of the dolls the positions that would have been necessary for the acts to take place between a large adult male and a small female child. In explaining how the act of anal intercourse occurred, she told how she held onto the sink while Bockting was behind her and "would press real hard and it hurt." The terminology used by the girl indicated a familiarity with sexual conduct not usually known by six-year-olds.[7] Further, the child's statements reflect knowledge

---

[7]We note, however, that the victim's mother testified that her daughter had seen adult sexual organs in the past, had showered with both her mother and

of sexual acts that a child of six would not usually be aware of absent personal experience.

Prior to describing her stepfather's conduct to her mother, the child hesitated because she was afraid Bockting would "beat her butt" and "mommy would send daddy away." After the victim's mother confronted Bockting and told him to leave, the girl wanted to hug and kiss him. This conduct is inconsistent with the notion that the six-year-old did not like her "father" or that she wanted him out of the home. In fact, the child's actions reflect feelings of affection for her stepfather. There was no apparent reason or motive for the child to fabricate a story of sexual misconduct by Bockting. "[I]t is virtually inconceivable that a child of this age would have either the extensive knowledge of sexual activities or the desire to lie about sexual abuse that would be required to fabricate a story such as the one told by [the child victim]." Morgan v. Foretich, 846 F.2d 941, 948 (4th Cir. 1988).

A careful comparison of the factors accorded significance in *Idaho v. Wright* with those present in the instant case causes us to conclude that: (1) sufficient spontaneity and consistent repetition existed in the child's various statements; (2) the child's mental state after a sudden awakening when she first told of her experiences was one of agitation and fear, both apparent from her statements and the fact that she was visibly shaken and crying; (3) the child's description of the incidents indicated a knowledge of sexual conduct not present in most children six years of age; (4) the child-like terminology used by the victim was reflective of candor rather than coaching; and (5) the child's display of affection for Bockting as he was preparing to leave was indicative of love rather than hate. Neither the foregoing factors nor any other aspect of the record evidence provides insights into a motive for dissembling on the part of the child. We therefore conclude that the district court was justified in finding that the child's hearsay statements were reliable and admissible under the criteria specified in NRS 51.385 and *Idaho v. Wright*.[8]

---

Bockting, and had seen her mother and stepfather having intercourse after entering the bedroom unnoticed by the adults. Although the mother testified to the contrary, Bockting stated that the child saw the couple engaging in oral sex, in addition to vaginal intercourse. Bockting also testified that the little girl was "interested" in sex.

[8]The majority in *Idaho v. Wright* determined that for purposes of satisfying the requirements of the Confrontation Clause, corroborating evidence is not to be considered in determining the reliability of hearsay statements. 497 U.S. at 822, 110 S.Ct. at 3150. This point has been vigorously criticized by legal scholars and by Justice Kennedy and the three other justices who joined in his dissent. Of necessity, we have reluctantly adhered to the majority opinion in our resolution of this appeal. We would, however, most respectfully urge the Court to reconsider the majority view.

Aside from relevancy, the *sine qua non* of admissible evidence is reliabil-

In viewing the totality of the circumstances surrounding the child's out-of-court statements, as defined in *Wright,* we conclude that the district court did not err in finding sufficient "particularized guarantees of trustworthiness" to admit the proffered statements. We therefore hold that NRS 51.385 is constitutional as applied to Bockting and his rights under the Confrontation Clause.

For the reasons stated above, we conclude that Bockting was fairly tried and convicted. Accordingly, we affirm the judgment of conviction entered by the district court.[9]

---

ity. Indeed, the *Wright* majority validates the admissibility of hearsay statements falling within firmly rooted exceptions on the basis of the indicia of reliability upon which they are founded. It appears to us that "corroborative evidence," as it relates to hearsay statements proffered on the basis of particularized guarantees of trustworthiness, is evidence that tends to make the reliability of the hearsay statement more probable. Such evidence seems to have special significance and justification under the "reliability" hearing mandated by NRS 51.385. The greater the corroboration, it would appear, the greater the prospect of the statement's trustworthiness. In the context of the instant case, the fact that medical evidence confirms that the child had been violated and injured by some blunt force which could include an erect adult penis, created an added element of reliability to the child's statements. The fact that there was no evidence of the victim being in the care of any adult male other than the defendant during the relevant period, was probative of reliability concerning both the fact of sexual abuse and the identity of the abuser. And yet, under the *Wright* ruling, we were forced to disregard these "particularized" sources of evidence of trustworthiness.

It would also appear difficult to accurately assess the "lack of motive to fabricate" factor identified by the *Wright* majority without resort to evidence extraneous to the "circumstances surrounding the making of the out-of-court statement." *Wright,* 497 U.S. at 821, 110 S.Ct. at 3149. For example, if it is necessary to exclude medical evidence of sexual abuse, it would also appear necessary to exclude evidence of marital discord on the part of the parents as a possible motive in the mother for having the child fabricate charges of sexual abuse against the husband. Moreover, the conclusion of the *Wright* majority that "[t]here is a very real danger that a jury will rely on partial corroboration to mistakenly infer the trustworthiness of the entire statement," *id.* at 824, 110 S.Ct. at 3151, seems to assume that any truth less than the entire truth is more dangerous than little or no truth at all. Even the firmly rooted exceptions to the hearsay rule are based upon probabilities short of certainty. In any event, the corroborative evidence is not, in the first instance, produced for a jury to consider in weighing the reliability of the proffered hearsay. It is the trial judge who must, under the totality of the circumstances, determine whether there are "sufficient circumstantial guarantees of trustworthiness" to permit introduction of the statement. NRS 51.385(1)(a). We are confident that our trial judges are sufficiently trained to use corroborative evidence as but one additional factor to weigh in determining the extent to which such hearsay statements bear indicia of reliability.

[9]THE HONORABLE MIRIAM SHEARING, Justice, did not participate in the decision of this matter.