**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARVIN HOWARD BOCKTING,
      *Petitioner-Appellant,*

v.

ROBERT BAYER,
      *Respondent-Appellee.*

No. 02-15866

D.C. No.
CV-98-00764-ECR

OPINION

Appeal from the United States District Court
for the District of Nevada
Edward C. Reed, District Judge, Presiding

Argued and Submitted
June 13, 2007—San Francisco, California

Filed September 27, 2007

Before: J. Clifford Wallace, John T. Noonan, and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge Wallace;
Dissent by Judge Noonan

13303

## COUNSEL

Franny A. Forsman, Federal Public Defender, Las Vegas, Nevada, for petitioner Marvin Howard Bockting.

Victor-Hugo Schulze, II and Rene L. Hulse, Nevada State Attorney General's Office, for respondent Robert Bayer.

## OPINION

WALLACE, Senior Circuit Judge:

Bockting appeals from the district court's order denying his petition for a writ of habeas corpus. Bockting challenges his state convictions on charges associated with the alleged sexual abuse of his then-six-year-old step daughter. We have jurisdiction under 28 U.S.C. § 2253(a). Bockting has not demonstrated the state court's adjudication on the merits: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings," 28 U.S.C. § 2254(d). Therefore, we affirm the district court's order denying his petition for writ of habeas corpus.

I.

Prior to his arrest, Bockting lived with his wife, Laura Bockting (Laura), his six-year-old step daughter, Autumn

Bockting (Autumn), and a three-year-old daughter, Honesty Bockting (Honesty), at the Paradise Motel in Las Vegas, Nevada. On Monday, January 11, 1988, Laura began attending evening classes at a local business college, leaving Autumn and Honesty at home under Bockting's exclusive care and supervision. The following Saturday evening, when Bockting was away, Autumn approached Laura, crying and "quite upset," and told Laura that Bockting "put his pee-pee in her pee-pee, and that daddy put his pee-pee in her butt and daddy made her suck on his pee-pee like it was a sucker. . . . and he put his chin in her pee-pee." Autumn informed Laura that all this had happened in the bathroom, and described the positions that Bockting used to accomplish the assault. She further stated that Bockting threatened to "beat [her] butt" if she revealed the assault to her mother.

Laura awoke the next morning to find that Bockting had returned to the motel room. She obtained rent money from him and dropped by the motel office to pay the past week's rent and have Bockting's name removed from the couple's rental papers. Returning to the motel room, she found Autumn in tears. Autumn explained that she had just told Bockting about their conversation from the previous evening and reported that "Daddy told me to tell you that I was lying. . . . I can't do that, mommy." Laura immediately confronted Bockting with Autumn's abuse allegations and ordered him to pack his things and leave. Bockting accused Autumn of lying, but nevertheless complied with Laura's request. Autumn wanted to give Bockting a hug and a kiss, but Bockting refused.

The following Tuesday, Laura called a rape hotline and agreed to take Autumn to a local hospital where they met Detective Charles Zinovitch, a member of the Las Vegas Metropolitan Police Department's sexual assault unit. Detective Zinovitch ordered an emergency room doctor to conduct a rape examination. The examining gynecologist-obstetrician, Dr. Stacy Rivers, discovered a fissure on Autumn's rectum.

Dr. Rivers estimated that the fissure, which was fresh but not actively bleeding, had occurred within the last week. Autumn's hymenal ring—the thin film of skin covering her vaginal orifice—was gaping wide open, which was unusual for a girl Autumn's age. Although Dr. Rivers testified that she could not be certain what kind of "instrument or foreign body" had caused the tear in Autumn's rectum and the laxness of her hymen, she concluded that these injuries had been caused by a "blunt type of trauma" applied to the rectum and vagina.

Two days later, Detective Zinovitch interviewed Autumn concerning the alleged sexual abuse. Although Autumn had been hysterical and uncommunicative at the hospital, she was now calm and cooperative. She described Bockting's alleged assault, and stated once again that Bockting "put his pee-pee into her pee-pee . . . butt and . . . mouth" and put "his chin on her pee-pee." She described the acts in vivid detail and reenacted the positions Bockting assumed during the assault with the aid of anatomically correct dolls, using age-appropriate terminology. Detective Zinovitch testified that the positions Autumn described were consistent with the relative body sizes of Autumn and Bockting.

At Bockting's March 30, 1988, preliminary hearing, Autumn was called to the stand. Autumn testified that she knew the difference between a truth and a lie and answered preliminary questions about the alleged assault and subsequent rape examination. Autumn was initially cooperative, and answered in the affirmative when asked whether Bockting had touched her inappropriately. She stated that the incident had occurred in the bathroom, when her mother was not home, and that Honesty was in the living room at the time. Her initial statements were consistent with what she told Laura and Detective Zinovitch, except in that she stated that Bockting left her pants on. Upon further questioning, however, Autumn began to cry and averred that she could not remember basic facts as to what had occurred in the bathroom

or the statements that she had told Laura and Detective Zinovitch. Laura encouraged Autumn to "be honest" and "tell the truth," but Autumn refused to answer any further questions, responding instead, "[y]ou already told them."

Bockting's jury trial commenced on August 15, 1988. The government, represented by Deputy District Attorney Lukens, called Autumn as its first witness. Autumn was uncooperative, however, and found unavailable.

After hearing testimony from Laura and Detective Zinovitch outside the presence of the jury, the judge concluded that Autumn's hearsay statements to Laura and the detective were credible and admissible. The court observed that there appeared no motive to fabricate, as there appeared to be no conflict between Autumn and Bockting. Further, the statements were neither irrational or implausible, they followed a chronological order, and they conveyed what appeared to be Autumn's perception of the events. While the court conceded that Autumn's statements at the preliminary hearing were not entirely consistent with the statements made to Detective Zinovitch and Laura, it noted that it was not uncommon for children to refuse to testify in similar circumstances. The court thus concluded that it had "no difficulty" concerning the reliability of the statements.

The court determined that Autumn's hearsay statements were admissible under Nevada Revised Statute 51.385 because Autumn was effectively unavailable for questioning:

> The very purpose of this statute was to avoid the problem we have here today where a little girl either is not willing to testify or for some reason is unable to or testifies in such an inconsistent manner that it means, in essence, that their testimony is worthless; and because of the fact that she is testifying in open court in front of strangers with all the things that surrounds that kind of a setting.

> . . . . The little girl is obviously unavailable. And as far as these two statements, I am meaning the one to the mother and the one to Detective Zinovitch, I think they are allowed—they are credible enough to be allowed to be related to the jury.

Bockting was convicted of three sexual assault counts: Counts I-II, forcing vaginal and anal intercourse on a child; and Count III, compelling a victim to perform fellatio on him. The Nevada Supreme Court dismissed Bockting's appeal on June 22, 1989, but the United States Supreme Court later vacated the state supreme court's order and remanded for further consideration in light of *Idaho v. Wright*, 497 U.S. 805 (1990). On March 8, 1993, the Nevada Supreme Court affirmed Bockting's conviction. *See Bockting v. State*, 847 P.2d 1364 (Nev. 1993) (per curiam) (*Bockting*).

While his application for a writ of certiorari was pending before the United States Supreme Court, Bockting filed a petition for post-conviction relief with Nevada's Eighth Judicial District Court. The state district court denied Bockting's petition, and Bockting appealed to the Nevada Supreme Court. On December 24, 1997, the state supreme court dismissed the appeal, effectively putting an end to Bockting's state court proceedings.

Bockting next sought relief in federal court, filing a petition for habeas corpus on December 30, 1998, followed by a second amended petition on May 17, 2000. The district court, exercising jurisdiction pursuant to 28 U.S.C. § 2254, denied the petition on March 22, 2002, and issued a certificate of appealability on April 26, 2002. While the appeal was pending, the Supreme Court issued its opinion in *Crawford v. Washington*, 541 U.S. 36 (2004), overruling *Ohio v. Roberts*, 448 U.S. 56 (1980), which was then the governing precedent. *See Whorton v. Bockting*, 127 S.Ct. 1173, 1181 (2007) (*Whorton*). *Crawford* held that "[t]estimonial statements of witnesses absent from trial" are admissible "only where the

declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine" the witness. 541 U.S. at 59. We broadened the certificate of appealability, and Bockting timely appealed.

Bockting's original petition for relief rested primarily on his constitutional rights under the Confrontation Clause, presenting a question of first impression in our circuit: whether *Crawford* applies retroactively to state convictions on habeas review. A divided panel concluded that the procedural rule under *Crawford* applies retroactively to cases on collateral review, and granted relief. *See Bockting v. Bayer*, 399 F.3d 1010, 1021-22 (9th Cir. 2005).

The Supreme Court granted certiorari. It held that *Crawford* had no retroactive application to cases on collateral review, and reversed and remanded for further proceedings. *Whorton*, 127 S.Ct. at 1177, 1184. We now consider Bockting's remaining arguments on remand.

## II.

Our review of Bockting's state convictions is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See Bell v. Cone*, 535 U.S. 685, 693 (2002). Under AEDPA, habeas relief is warranted only where the state court's adjudication of the merits: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d)(1)-(2). A state court conviction "can involve an 'unreasonable application' of federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objec-

tively unreasonable." *Van Tran v. Lindsey*, 212 F.3d 1143, 1150 (9th Cir. 2000), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003). State court findings of fact are presumed correct unless the presumption is rebutted with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

**[1]** Since the Supreme Court has concluded that *Crawford* has no retroactive application to cases on collateral review, we apply the law as it stood before that case. Prior to *Crawford*, an out-of-court statement against a criminal defendant was admissible at trial if two conditions were met. *See Roberts*, 448 U.S. at 65-66. First, "in order to introduce relevant statements at trial, state prosecutors [must] either produce the declarants of those statements as witnesses at trial or demonstrate their unavailability." *Bains v. Cambra*, 204 F.3d 964, 973 (9th Cir. 2000), *citing Roberts*, 448 U.S. at 65-66. Second, even if prosecutors succeed in demonstrating unavailability, the statements are only admissible if they bear "adequate indicia of reliability." *Roberts*, 448 U.S. at 66 (internal quotation marks omitted). The "indicia of reliability" requirement is met if the statements fall within a "firmly rooted hearsay exception" or contain "particularized guarantees of trustworthiness." *Id.*

In Bockting's state proceedings, the Nevada Supreme Court determined that the government satisfied these two requirements. *See Bockting*, 847 P.2d at 1366-70. Bockting challenges these determinations on federal habeas review. Mindful of our duty to defer to the state supreme court's factual determinations and reasonable applications of Supreme Court precedent, 28 U.S.C. § 2254(d)(1)-(2), we consider Bockting's arguments.

### III.

Bockting contends that relief is warranted because the Nevada Supreme Court decision conflicts with *Idaho v. Wright*, 497 U.S. 805 (1990), and applies the wrong standards

in determining the admissibility of Autumn's hearsay statements. He argues that the state court decision involved an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts.

**[2]** Whether Autumn's hearsay statements "were sufficiently reliable to be admitted without violating [*Roberts*] is a mixed question" of law and fact. *Swan v. Peterson*, 6 F.3d 1373, 1379 (9th Cir. 1993). We review the Nevada Supreme Court's reliability determination to ascertain whether it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see also Davis v. Woodford*, 333 F.3d 982, 990 (9th Cir. 2003) (stating that subsection 2254(d)(1) applies "to mixed questions of law and fact" (citing *Williams v. Taylor*, 529 U.S. 362, 407-09 (2001))). To the extent the Nevada Supreme Court's determination of "particularized guarantees of trustworthiness" rests on findings of fact, we must consider whether it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). We presume that the state court's findings are correct unless the presumption is rebutted with clear and convincing evidence. *See id.* § 2254(e)(1).

In *Wright*, the Supreme Court examined whether the admission at trial of certain hearsay statements made by a child declarant to an examining doctor violated the defendant's rights under the Confrontation Clause. 497 U.S. at 808. *Wright* reiterated the *Roberts* test, confirming that hearsay statements made by an unavailable witness are admissible only where the statements bear "adequate indica of reliability." *Id.* at 815 (internal quotation marks omitted), *quoting Roberts*, 448 U.S. at 65. Reliability may be "inferred without more" where the statements fall within a firmly rooted hearsay exception. *Id.* at 815. Where no hearsay exception applies, however, the statements are "presumptively unreliable" and meet Confrontation Clause reliability standards only if "sup-

ported by a showing of particularized guarantees of trustworthiness." *Id.* at 817, *quoting Lee v. Illinois*, 476 U.S. 530, 543 (1986) (internal quotation marks omitted).

**[3]** *Wright* held that the " 'particularized guarantees of trustworthiness' required for admission [of hearsay statements] under the Confrontation Clause must . . . be drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief." *Id.* at 820. Relevant factors in child sexual abuse cases include: (1) spontaneity and consistent repetition, (2) the mental state of declarant, (3) use of terminology unexpected of a child of similar age, and (4) lack of motive to fabricate. *Id.* at 821-22. The Court observed, however, that these factors were "not exclusive, and courts have considerable leeway in their consideration of appropriate factors." *Id.* at 822. It "therefore decline[d] to endorse a mechanical test for determining 'particularized guarantees of trustworthiness' under the Clause," stating instead that the "unifying principle is that these factors relate to whether the child declarant was particularly likely to be telling the truth when the statement was made." *Id.*

## A.

We first consider whether the Nevada court's decision was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2).

**[4]** In Bockting's underlying state case, the Nevada Supreme Court determined that while Autumn's statements did not fall within any "firmly rooted hearsay exception," they were nevertheless admissible because the statements bore the "particularized guarantees of trustworthiness" required under *Roberts. Bockting*, 847 P.2d at 1367-70. Applying the test outlined in *Wright*, 497 U.S. at 821-22, the court identified several facts supporting the trustworthiness of Autumn's statements, including (1) the "spontaneity and consistent repe-

tition" of her statements, (2) Autumn's "agitation and fear," reflected by "the fact that she was visibly shaken and crying," (3) her "knowledge of sexual conduct not present in most children six years of age," (4) her "child-like terminology" which "was reflective of candor rather than coaching," and (5) her "display of affection for Bockting," which was "indicative of love rather than hate." *Bockting*, 847 P.2d at 1369.

These findings are not unreasonable based on the record. On two different occasions, Autumn made spontaneous statements to her mother concerning the alleged assault: on July 16, 1988, when Autumn first complained of the assault; and again on the morning of July 17, 1988, when she cried and told her mother that "Daddy told me to tell you that I was lying . . . I can't do that, mommy." Second, when taken as a whole, Autumn's statements of abuse are consistent. Autumn's initial allegations of abuse, on July 16, 1988, are in accord with the abuse that she described to Detective Zinovitch. Her demonstration with the dolls, in front of Detective Zinovitch, further supported her statements. Her outburst to her mother on July 17, 1988, that Bockting told her to say that she was lying, also corroborated her allegations of abuse. Finally, Autumn's testimony at the preliminary hearing is more consistent than not: (1) Autumn answered "yes" when asked whether Bockting had touched her inappropriately, and (2) she testified that her mother had not been home, that Honesty was in the living room, and that the incident occurred in the bathroom. Although Autumn's statement that her pants were on at the time of the assault is inconsistent with her prior statements, her preliminary hearing testimony as a whole corroborates her previous description of the alleged assault.

The other *Wright* factors similarly cut in favor of the reasonableness of the Nevada Supreme Court's determination on trustworthiness. When Autumn initially described the alleged assault to Laura, she was "quite upset" and crying. She cried again when she told Laura that Bockting told her to deny the

story the next day. The vivid descriptions that Autumn gave to both Laura and Detective Zinovitch also reflect an unusual knowledge of sex for a child her age, even given the fact that Autumn had on occasion walked in on intercourse between Bockting and Laura. Further, the terminology used by Autumn in her statements both to Laura and Detective Zinovitch was consistent with what may be expected from a child her age: she described the alleged assault to Laura and Detective Zinovitch with reference to her own "butt" and "pee-pee" and Bockting's "pee-pee," and stated that "white bubbly stuff" came out of Bockting's penis. Finally, Autumn's affection for Bockting evidenced a lack of motive to fabricate.

Bockting contends that the Nevada court created facts not present in the record in determining that the "veteran detective conducted the recorded interview with the child in a manner that was not suggestive, leading, or indicative of a predetermined resolve to produce evidence of child abuse," *Bockting*, 847 P.2d at 1368-69. Not so. Detective Zinovitch testified that he was employed by the Las Vegas Metropolitan Police Department for sixteen years, and had been assigned to the sexual assault unit for four years. He stated that he was "very careful" when interviewing a child, and that he would try to "have the child describe what had happened in her own words." He further testified that after Autumn stated that Bockting had hurt her, he asked her "What do you mean he hurt you? How did he hurt you?" Detective Zinovitch's testimony reflects that he was experienced at interviewing children and that he used open-ended questions during his interview with Autumn. This record supports the Nevada Supreme Court's finding that the detective did not use suggestive or leading questions during his interview with Autumn, and we thus disagree that the court created facts not present in the record.

We also disagree with the assertion that the Nevada court's reliance on Autumn's use of the dolls in her interview with

Detective Zinovitch somehow rendered the decision an "unreasonable determination of the facts." Bockting cites one study in support of his argument that "considerable disagreement" exists regarding the propriety of using the dolls. Bockting's reference to a single study on doll evidence, without more, is not enough to suggest that the Nevada court's opinion was "based on an unreasonable determination of the facts in light of the evidence presented," *see* 28 U.S.C. § 2254(d)(2).

**[5]** Our review of the record evidence satisfies us that the Nevada Supreme Court's opinion was not "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). We presume that the state court findings of fact are correct unless rebutted by clear and convincing evidence, *id.* § 2254(e)(1), and Bockting has failed to overcome that presumption.

### B.

We turn to Bockting's contention that the Nevada opinion was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," *see* 28 U.S.C. § 2254(d)(1).

Bockting asserts that the state courts misapplied *Roberts* in two ways. First, he argues that the trial court misapplied *Roberts* by applying a presumption in *favor* of admissibility. However, no such burden is evident from the trial record. Somewhat more interesting is Bockting's second argument, that the Nevada Supreme Court's failure to state that the "presumptive[ ] unreliab[ility]" of Autumn's hearsay statements is contrary to *Wright*.

**[6]** The Nevada Supreme Court considered Bockting's appeal on remand, with the express instruction from the United States Supreme Court to consider the case under

*Wright.* In the resulting opinion, the Nevada court recited the proper test under *Roberts*, that hearsay statements made by an unavailable witness are admissible only in two circumstances: (1) where the statement fits a "firmly rooted" hearsay exception, or (2) the statement "reflects particularized guarantees of trustworthiness." 847 P.2d at 1367 (internal quotation marks and citation omitted). In evaluating the admissibility of Autumn's hearsay statements, the Nevada Supreme Court made a "careful comparison of the factors accorded significance in *Idaho v. Wright* with those present in the instant case." *Bockting*, 847 P.2d at 1369. The court raised and discussed the relevant *Wright* factors (spontaneity, repetition, mental state, terminology, and motive to fabricate) before determining that, "[i]n viewing the totality of the circumstances surrounding the child's out-of-court statements, as defined in *Wright*, we conclude that the [trial] court did not err in finding sufficient 'particularized guarantees of trustworthiness' to admit the proffered statements." *Id.* at 1369-70. In light of the Nevada court's extensive discussion and reliance on *Wright*, we do not agree with Bockting that the Nevada Supreme Court's failure to mention that Autumn's hearsay statements were "presumptively unreliable" renders it contrary to *Wright*.

**[7]** *Wright* did refer to a statement from *Lee v. Illinois* that hearsay evidence not within a firmly rooted exception is "presumptively unreliable," but then states that such hearsay meets the Confrontation Clause if it is supported by a "showing of particularized guarantees of trustworthiness." *Lee*, 476 U.S. 530, 543 (1986) (quotation marks and citation omitted). But it is this guarantee of trustworthiness that overcomes the presumption. As the Nevada Supreme Court's analysis of these factors was not an unreasonable application of *Wright*, it was unnecessary to mention the word "presumption."

Bockting also mistakenly argues that the Nevada Supreme Court's decision involved an unreasonable application of clearly established federal law because evidence confirming

the unreliability of Autumn's statements was rejected or ignored. In its opinion, the Nevada Supreme Court recognized some inconsistencies in Autumn's statements. It observed that during the preliminary hearing, Autumn stated that her pants were not removed during the alleged assault, that she was unable to remember how Bockting touched her, and that she could not remember what she had told her mother or Detective Zinovitch. *Bockting*, 847 P.2d at 1366-67. It concluded, however, after considering the "totality of the circumstances surrounding the child's out-of-court statements, as defined in *Wright*" that the trial court properly admitted the statements. *Id.* at 1369-70. After evaluating the court's discussion of the *Wright* factors, we do not agree that the Nevada Supreme Court's opinion was defective merely because it failed to mention every fact that Bockting believes supports his case.

**[8]** Finally, Bockting argues that *Crawford* did not change the rule with respect to testimonial statements, and suggests that confrontation would be required in this case under either *Roberts* or *Crawford*. This argument is foreclosed by *Whorton v. Bockting*, which stated that *Crawford* "overruled *Roberts*" and "announced a new rule." 127 S.Ct. 1181 ("The *Crawford* rule is flatly inconsistent with the prior governing precedent, *Roberts*, which *Crawford* overruled").

**AFFIRMED.**

---

NOONAN, Circuit Judge, dissenting:

This appeal, as Judge Wallace accurately puts it, turns on whether the Supreme Court of Nevada unreasonably applied *Idaho v. Wright*, 497 U.S. 805 (1990) to the facts of this case. In its first remand of the case, the United States Supreme Court had asked the Nevada Supreme Court to consider its affirmance of Bockting's conviction in the light of *Wright*. *Bockting v. Nevada*, 497 U.S. 1021 (1990). Our court must

ask whether the Nevada Supreme Court has reasonably done so.

To apply *Wright* reasonably, the Nevada Supreme Court had to decide whether Autumn was not available as a witness and whether her statements as reported by her mother and by the detective bore such particularized guarantees of truthworthiness that cross-examination of her would be only marginally useful.

Both issues mixed fact and law. There had to be a factual basis for finding that Autumn could not take the stand. There had to be a factual basis for finding that such particularized guarantees of Autumn's truthworthiness existed that cross-examination would be of marginal utility. Instructed by *Wright*, the Nevada Supreme Court knew the rule that it must apply in each instance. It could not make the rule applicable by imagining the facts or by abbreviating the rule to the point of misunderstanding it.

The position in which the Nevada Supreme Court was put by the remand may be illustrated by an analogy from baseball. The home plate umpire decides if a runner is out when there is a close call at the plate. The umpire's melding of what he sees with the rule he knows cannot reasonably be challenged. But when the runner is stealing second, and the third base umpire calls him out because he did not reach third, the third base umpire is subject to reversal. He has either not understood the facts or not understood the rule he purports to apply, or he has understood neither. Is the Nevada Supreme Court in the position of the supposed home plate umpire or in that of the imagined third base umpire?

Was Autumn not available as a witness? The Nevada Supreme Court devoted footnote four of its opinion to this question and stated:

> Although NRS 51.385 does not require the unavailability of the hearsay declarant as a prerequisite to the

admissibility of the declarant's statements, we are satisfied on this record that the trial judge correctly determined that the child was unavailable as a witness. The record reveals, as described by the prosecutor, that the child "froze" and would not even stand or communicate to take the oath. Moreover, defense counsel did not contest the district court's ruling concerning the child's unavailability as a witness.

This single paragraph, central to the Nevada Supreme Court's finding that Autumn was not available, first endorses the trial judge's conclusion to that effect and secondly accepts the prosecutor's claim that Autumn "froze." Neither the first nor the second point establish Autumn's unavailability. The trial judge did not make any finding at all as to Autumn's unavailability. To rely on what the trial court did is to rely on nothing except his decision to let in her hearsay statements. The trial judge identified no basis for this result.

What the trial judge did say was something that showed him to be confused about the relevant rule. He said, "The very purpose of this statute [governing the testimony of a child under ten] was to avoid the problem we have here today where a little girl either is not willing to testify or for some reason is unable to or testifies in such an inconsistent manner that it means, in essence, that [her] testimony is worthless." In the trial judge's mind, the child witness is unavailable, if, as in Autumn's case, her testimony is inconsistent so that it becomes "worthless." That is surely a misstatement of the rule determining a witness's unavailability.

The second leg on which the Nevada Supreme Court stood begins with the prosecutor's characterization of what Autumn did; supplements this reference by a reference to what the record shows; and adds that defense counsel did not object. To take the last point first, there was no ruling to which defense counsel could make a record; the trial judge simply

assumed that Autumn, inconsistent as she was in her statements, was not available. What the record reveals as to her unavailability is her nonresponsiveness to a colloquy between her and the judge that could not have consumed more than a minute. The record reveals no effort by the judge to make her more at home or to consider measures that could be taken to lessen her reluctance. Autumn "froze" as the prosecutor said. A momentary freezing is insufficient ground to find unavailability established especially when the witness is already present and the conclusion is reached by a judge confused as to the relevant rule.

The "Sixth Amendment establishes a rule of necessity." *Ohio v. Roberts*, 448 U.S. 56, 65 (1980). "In the usual case . . . the prosecution must either produce, or demonstrate the unavailability of, the declarant . . ." *Id*. No necessity was proved to justify the introduction of the hearsay. Neither the trial judge nor the Nevada Supreme Court in cursory fashion referencing the record have taken seriously the first requirement of *Wright*. The witness whose words will be reported by someone else must actually be not available. We owe deference to the state court's findings of fact. We do not owe deference to the Nevada Supreme Court's endorsement of a ruling never made and of a statement by the prosecutor.

Did the judicial umpire, the Nevada Supreme Court, do any better in its fusing of facts with law to find particularized guarantees of trustworthiness making cross-examination, if not unnecessary, at least of little use?

To begin with, the Nevada Supreme Court missed the principle overarching any admission of this sort of hearsay: cross-examination of the child, the declarant herself, would not materially increase a jury's confidence that she had said what the retailers of the hearsay said she said. The overarching principle is put with great clarity by *Wright* quoting Wigmore:

> "The theory of the hearsay rule . . . is that the many possible sources of inaccuracy and untrustworthiness

> which may lie underneath the bare untested assertion of a witness can best be brought to light and exposed, if they exist, by the test of cross-examination. But this test or security may in a given instance be superfluous; it may be sufficiently clear, in that instance, that the statement offered is free enough from the risk of inaccuracy and untrustworthiness, so that the test of cross-examination would be a work of supererogation." 5 J. Wigmore, Evidence § 1420, p. 251 (J. Chadborn rev. 1974).

*Wright*, 497 U.S. at 819.

The Supreme Court of the United States, embracing this "theory of the hearsay rule" went on to restate the rule's rationale in its own terms and to illustrate it in application:

> In other words, if the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, then the hearsay rule does not bar admission of the statement at trial. The basis for the "excited utterance" exception, for example, is that such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation, and that therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and that cross-examination would be superfluous.

*Id.* at 820.

As the Court declared: "Our precedents have recognized that statements admitted under a 'firmly rooted' hearsay exception are so trustworthy that adversarial testing would add little to their reliability." *Id*. at 820-21. The Court went on to say that:

> "the particularized guarantees of trustworthiness"
> must be at least as reliable as evidence admitted
> under a firmly rooted hearsay exception . . .

*Id.* at 821.

The Nevada Supreme Court handicapped itself severely by not stating, or apparently grasping, the rationale that would let into a trial the nontestimonial statements of a child. The Nevada Supreme Court noted that the Supreme Court had not endorsed any mechanical test. The Nevada Supreme Court then proceeded in mechanical fashion to find three particularized guarantees. Let us look at them.

The first is that Autumn awoke from sleep, distressed and sobbing, and after being reassured by her mother, gave details of Bockting's alleged acts. This statement did not qualify as an "excited utterance" under the firmly-rooted exception to the hearsay rule. The Nevada Supreme Court made a half-effort to bring the statement within this exception ("the child's outpouring . . . reflected a natural spontaneity indicative of truth"); but the court did not invoke the firmly-rooted exception. Instead, the court expressed incredulity that a child "would conjure up the parade of horribles she related about her stepfather." What the hearsay reported was a "parade of horribles" — does that make the story more or less credible? Are you more trustworthy when you let your imagination go? The court overlooked the totality of the circumstances in which the horribles were paraded. In her mother's words, "She looked like she had just woke up from a bad dream and she was quite upset." It is a commonplace phenomenon for people of all ages to have nightmares and to awake in distress. What they then say was bothering them carries no guarantee of trustworthiness; they are coming out of sleep, still responding to their sleeping-state impressions.

Autumn's second declaration was made to the police officer in the presence of her mother. The Nevada Supreme Court

found that its guarantee of trustworthiness was that it was "consistent with the details she had previously told to her mother." That consistency carries little weight unless her nighttime declaration to her mother was trustworthy. The Nevada Supreme Court did not note that two days earlier, Autumn had refused to speak to the detective. Neither did the court note the psychological compulsion not to let down her mother who was counting on her to confirm what the mother had reported.

The Nevada Supreme Court treated Autumn's arrangement of the dolls as her "third consistent description of the events." At the preliminary hearing, Detective Zinovitch gave an account of Autumn and the dolls: Before he began to question her, he told her that he had some dolls he might show her. After he had finished his questions, she asked, "Can I see the dolls now?" Zinovitch showed her the dolls. As he testified:

> First I had her look at the dolls, take the clothing off the dolls, so we could identify what she feels would be the adult dolls, what would be the juvenile dolls, male, female, to be sure she knew what she was talking about when she talks about the suspect's penis or pee-pee, what the vagina is or what she calls her pee-pee. And, you know, we went through that type of questioning.
>
> After I was sure that she was aware of the specific body parts, then I asked her to show me — I asked her if she could show me what positions had actually taken place in the different acts.

Zinovitch's tape recorder, which he had turned off when he was identifying body parts, was turned on to record what Autumn then said. According to his testimony, she described what had happened, illustrating it by reference to the dolls, using a male adult doll and a young female doll to show "the

exact positions that had occurred." He added, "She was happy throughout the interview."

The question must be asked whether Autumn's arrangement of the dolls was a guarantee of the trustworthiness of what she had told Zinovitch. Five things mark this part of his interview. First, he initiated the conversation about the sex organs of the dolls. Second, he instructed Autumn to take off the dolls' clothes. Third, he turned off the tape while he prepared her. He asked her a leading question: "When he put his pee-pee in your vagina, show me how you were laying." Fifth, she was happy as she reenacted the events.

The dolls would be an unconventional way of guaranteeing the truth of what Autumn is reported to have said. The immediate circumstances of what she said at this time are far from giving confidence in Zinovitch's report. Not only did he testify to the leading question he asked her, but he conceded that he conducted the preliminary conversation about the sex organs of the dolls, and he directed the removal of the dolls' clothes. Although he had been taping the interview, he chose not to tape his preliminary conversation that primed Autumn on the body parts. And throughout this reliving of what is portrayed by the prosecution as a fearful trauma, Autumn seemed happy! Her happiness is part of the totality of the circumstances of her statement. Her happiness must undermine confidence in the credibility of what she is said to have said.

We own no deference to the Nevada Supreme Court as to its understanding of governing constitutional principle. Like the third base umpire of the analogy, the Nevada Supreme Court has misunderstood the relevant rule. That court has not understood why a statement can qualify as an exception to the requirements of the Confrontation Clause. That court has not grasped that the governing principle is: would cross-examination be of significant value.

The Nevada Supreme Court failed to apply *Wright* reasonably to Autumn's availability as a witness and to the value of

cross-examination in testing the trustworthiness of the statements attributed to her, and so has not asked the question it had to answer: Would cross-examination have materially increased confidence in Autumn's reported statements? It is difficult to imagine a lawyer or a judge who would answer the question No. Bockting's right to confront the only percipient witness against him was grievously violated.

## AEDPA and the Nevada Supreme Court

AEDPA directs us to determine whether the state decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). So far this analysis has proceeded as though the highest state court to rule on the case had the power to determine the facts. But this is not so.

The constitution of the State of Nevada prohibits the Nevada Supreme Court from finding facts in the course of a criminal appeal. Nev. Const. art. 6, § 4; *Lane v. Second Judicial Dist. Court*, 760 P.2d 1245, 1261 (Nev. 1988) (Steffen, J., concurring). It must be assumed the Nevada Supreme Court obeyed or, that if it did not, its findings were unlawful and may be disregarded.

In terms of the analogy with baseball, this split between the ability to determine the facts and the ability to state the law constitute a distinct problem. It is as though the home plate umpire could only find the facts — the catcher touched the runner; the runner had not crossed home plate; while a super-umpire would have the power to review the application of the rules and pronounce the runner to be out. Certainly, the super-umpire could not invent facts and say, "The runner crossed the plate. He's not out."

Out of an abundance of caution, it has been assumed that some facts could be determined by the Nevada Supreme Court. Now, however, as an alternative approach, the analysis

is founded on what was found by the only Nevada court that had power to find facts, the trial court.

As to Autumn's unavailability as a witness, as already noted, the trial court made no finding of fact. Consequently, there is nothing for us to review or to treat with deference and no guarantee of the statement's trustworthiness shown. Nor is anything shown by the statement's plausibility. The prosecutor wouldn't be trying to introduce it if it were implausible. Chronological order seems to be characteristic of any narrative. The judge found that Autumn had no motive to fabricate. This negative conclusion was scarcely a guarantee of trustworthiness. That the trial judge thought the statements reflected Autumn's perceptions and that he found the account "credible" merely presents the trial judge's view of the evidence. At the end of his brief analysis, he acknowledges that Autumn spoke differently at the preliminary hearing. Plausibility, rationality, chronological order, absence of motive to lie, and credibility create no exception to the constitutional requirement set by the Sixth Amendment. The writ of habeas corpus must be issued.

As to the other requirements of *Wright*, the trial court found the hearsay statements "not irrational or not plausible. They follow chronologically the events. They tell what the little girl's perception of it was and it seems to be credible, although I grant that at the preliminary hearing there is a different version." That a statement does not appear irrational and that it appears plausible and credible to the judge — none of these are particularized guarantees. And when the judge concedes that Autumn's testimony is not consistent, how could anyone conclude that cross-examination of her would be of little utility? No findings as to the necessary guarantees have been made. For this reason, too, the writ should issue.