Edward S. **KENNEDY,** Petitioner,

v.

Mike **KNOWLES,** Warden, Respondent.

No. C 04–4342 WHA (PR).

United States District Court,
N.D. California.

March 31, 2008.

---

Edward S. Kennedy, Represa, CA, pro se.

Pamela K. Critchfield, San Francisco, CA, for Respondent.

## DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS

WILLIAM ALSUP, District Judge.

This is a habeas corpus case filed by a state prisoner pursuant to 28 U.S.C. 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent has filed an answer and a memorandum of points and authorities in support of it, and has lodged exhibits with

the court. Although the time for him to do so was extended, petitioner has chosen not to file a traverse. For the reasons set forth below the petition is DENIED.

## STATEMENT

A jury convicted petitioner of first degree murder. He was sentenced to life without parole. His conviction was affirmed on direct appeal by the California Court of Appeal, and the California Supreme Court denied review.

As grounds for habeas relief he asserts that: (1) his lawyer had a conflict of interest; (2) his rights under the Confrontation Clause of the Sixth Amendment were violated by admission of out-of-court statements; and (3) counsel was ineffective in challenging DNA evidence.

Petitioner does not dispute the following facts, which are taken from the opinion of the California Court of Appeal.

In 1996, Beatrice Kennedy lived at 1444 47th Avenue in San Francisco with her sons Emmett Kennedy and appellant. At that time Beatrice was 80 years old, Emmett was 56, and appellant was 40 years old. Appellant lived upstairs with his mother, and Emmett had an apartment downstairs in the rear portion of the garage.

Beatrice and Emmett jointly owned a green Buick with a leather interior, and they had the only keys to the car. The car was usually driven by Emmett. Appellant drove very little because he had a bad leg.

The victim, Sergio Crockett, a 100-pound boy who was 5 feet and 1 inch tall, was a drug dealer who "hung out" with Dion Ruggs, James Sullivan, and others on the corner of 46th Avenue and Judah, selling crack cocaine. [FN2. Although the record does not contain Crockett's age, the medical examiner described him as pre-pubescent.] This corner was a block and a half from appellant's home. Appellant and his brother Emmett were frequent customers, and appellant bought on credit. Dion Ruggs testified that he was with Crockett the night before he was killed. Crockett saw appellant and went over to talk with him. They were having a heated argument by the time Ruggs joined them. The argument was about money. Crockett said appellant owed him $40, and appellant said it was his brother who owed the money. Appellant admitted to Ruggs that he had told Crockett he would pay his brother's debt. Appellant then told Crockett to come to his house the next night, and he would pay him.

James Sullivan testified that he used to sell drugs with Crockett at 46th and Judah. He sold crack cocaine to appellant a couple of times a week. Sullivan said he would sometimes go to appellant's house to deliver the drugs and that he had cooked cocaine there a few times. Sullivan was with Crockett the night he was killed. Crockett told him he had to go pick up some money from appellant at 9 p.m.

Emmett Kennedy asserted his Fifth Amendment privilege and refused to testify at trial. His preliminary hearing testimony was therefore read to the jury. At the preliminary hearing, Emmett testified that he and appellant were driving around the neighborhood on the afternoon of February 24, 1996, when they saw Sergio Crockett. Crockett said to appellant, "Hey, where is my money?" Appellant told Crockett to come by the house at 9 p.m. that night to collect. Earlier, appellant had told Emmett he (appellant) owed Crockett $40 for drugs.

Emmett was in his apartment downstairs when Crockett arrived about 9 p.m. that night. After Crockett came into his apartment, he and Crockett walked to the garage where they saw

appellant. Emmett then returned to his apartment to watch television. The next thing Emmett knew, appellant and Crockett were back in his apartment, Crockett fell backward, and landed on Emmett's couch. Appellant dove onto Crockett, reached over behind the couch, grabbed an eight-inch knife and stabbed Crockett in the shoulder. When appellant tried to stab Crockett again, Crockett grabbed the knife by the blade, and they struggled for possession of it, leaving a bloody smear on the couch. As they struggled, appellant kept asking, "Where is your dope?" Crockett said he had drugs stashed around the corner at the bottom of the dumpster. Emmett said appellant told him that if Emmett went and got the drugs, appellant would not stab Crockett again.

Emmett went to the dumpster and found it full of garbage, so he did not look through it. Emmett returned home and asked Crockett to tell him exactly where the dope was. Crockett explained it was underneath the right side of the dumpster. Emmett went back to the dumpster and still could not find anything. He returned and found that appellant had pulled Crockett's pants down and tied his feet with one of Emmett's amplifier cords. Appellant sent Emmett to look for the stash a third time, but he still did not find it. Emmett asked appellant to take Crockett to the hospital.

Emmett, appellant, and Crockett went to the garage and got into the car. Emmett was driving, Crockett was in the middle of the front seat, and appellant was in the front passenger's seat. Appellant agreed they would take Crockett to the hospital after they retrieved the drug stash. As they were driving, appellant stabbed Crockett in the arm with the knife. When they arrived at the dumpster, Crockett got out, reached up under the dumpster and retrieved a bag. Instead of going to the hospital as promised, appellant directed Emmett to drive back to their house. There, all three of them got out of the car, and appellant took Crockett back to Emmett's apartment where appellant started smoking the crack cocaine he had just taken.

Emmett testified he again told appellant to take Crockett to the hospital. He, Crockett, and appellant again got in the car and started to drive to the University of California Hospital. Appellant told Emmett to drive to French Hospital instead because the police would be at the University of California hospital. As they were driving, appellant announced that Crockett was dead. Emmett turned and saw appellant holding a knife to Crockett's throat. Crockett's head was hanging down and his eyes were closed. Crockett then came to life, saying the knife was stuck in him. Appellant responded by "wailing with the knife," stabbing Crockett repeatedly.

Emmett felt Crockett's body convulse and then die. He started yelling at appellant to get Crockett out of the car. Emmett stopped the car, and appellant pulled Crockett out of the car, leaving his body on the street. Appellant told Emmett to drive him to Stow Lake in Golden Gate Park. Emmett somehow ended up at a different lake near 36th Avenue where appellant tossed the knife into the lake.

When they returned home, Emmett removed his bloody clothing and took a shower. While Emmett was showering, appellant took Emmett's bloody clothes and drove off in the car, returning about 20 minutes later. When appellant returned, he suggested they go spend the night at a motel in Berkeley, which they did. The next morning appellant drove off in the car. Emmett stayed in the motel for two days, but then he began

getting sick and vomiting. When Emmett returned home, he found that appellant had taken all of his furniture and the rug out of his apartment, and put all of his clothes upstairs.

Emmett went to the Veteran's Administration hospital two days after the incident because he was so upset, vomiting blood, and shaking. He saw a physician and a psychiatrist. When they asked what was bothering him, Emmett told them he had been a held hostage during a murder.

Mary Ellen Smith, a psychiatric technician at the Veteran's Administration hospital testified that Emmett told her appellant had stabbed a drug dealer numerous times while demanding to know where his drugs were. [FN3. She was known as Mary Ellen Briggs in 1996, and is sometimes referred to as Briggs in the record. Smith is her married name.] He told her that after the dealer said the drugs were out behind a dumpster, either he or appellant stayed with the dealer while the other went to the dumpster to find the drugs. After that, they put the dealer in the car to take him to the hospital. Emmett told Smith that as they were driving through Golden Gate Park, the dealer's head was resting on Emmett's shoulder and he said, "Please don't let him kill me, help me." Emmett then heard the "knife hit bone." Emmett told Smith they put the drug dealer on the street. Emmett said he participated because he was afraid if he didn't, his brother would kill him. Emmett said he couldn't sleep because he kept hearing the victim's voice in his head.

Darwish Dajani testified that Emmett came into his store in February 1997 (a year after the killing) in a distraught condition. He said his brother held him and a kid hostage. Emmett saw his brother stab the kid twice in the garage. Emmett told Dajani they got into the car to take the kid to the University of California Hospital but then decided to go to Kaiser instead. Dajani testified that Emmett told him that while they were in the car, appellant stabbed the kid again. Emmett told Dajani that when they saw the kid had died, they dumped his body on Anza Street.

Terry Rhodes, moved into Emmett's apartment sometime in late 1995 or early 1996. Rhodes testified that Crockett came to the house to sell drugs. She recalled several disagreements about drugs and money for drugs between Crockett and Emmett. After Crockett had left following a dispute, Emmett had said "he would take all of their dope and fuck them. . . . He would make a little punk out of them." Rhodes left after this incident and returned about a week later. When she returned, she saw that all of the furniture had been removed from Emmett's apartment.

Crockett's body was found in the street at the intersection of 12th Avenue and Anza Street around 11:20 p.m. on February 24, 1996, by San Francisco Police Officer Peter Ionin. A cord was wrapped around his ankles. Michael Gaynor, a San Francisco Police Inspector with expertise in bloodstains, examined bloodstains on Crockett's legs and concluded that his pants had been pulled down when drops of blood had fallen on them. He also found blood smeared inside the pants pockets, which would have occurred from someone with blood on his hands sticking them into Crockett's pockets. The large amount of blood on the thigh area suggested that Crockett had been in a sitting position when assaulted. The pattern of the blood on the pants was consistent with Crockett having been seated in the middle of the front seat and being stabbed by someone in the passenger seat.

Dr. Jason Trent of the San Francisco Medical Examiner's Office, testified that Crockett had died of multiple stab wounds. A total of 46 stab wounds had been inflicted, 13 of which were defense wounds incurred as the victim attempted to ward off the blows. The wounds were consistent with having been inflicted by a butcher knife or a kitchen carving knife. The injuries indicate the victim was sitting and were consistent with having been inflicted by a person sitting to the victim's right.

In May 1996, police inspector Gaynor and other officers examined the Kennedy Buick for possible evidence. He had been told the car may have been used to transport the body, so he examined the seats, floorboard, and trunk for possible blood and found none. He did not, however, examine the headliner or visor. Gaynor examined the car a second time in February 1997 after Emmett gave his statements to the police. This time he was asked to examine the upper portion of the car as well. Using luminal and paying extra attention to the upper part of the car, Gaynor found indications of blood spots on the passenger's visor and headliner. Gaynor cut out the headliner and the visor and sent them to the crime lab.

Alan Keel, a criminalist and DNA analyst in the San Francisco crime laboratory, found tiny blood spots on both the visor and the headliner. They were sitting on the surface of the fabric, which indicated that they were blood spatters. Keel performed DNA testing and analysis on these blood spots using DQ-alpha, polymarkers, and D1 S80 methods, comparing them to a blood sample from Crockett's body. The testing revealed the following: (a) using DQ-alpha, Crockett's blood was 2–2 and the visor spot was 2–2; (b) using polymarkers, at the LDLR locus Crockett's blood was B–B and the visor spot was B–B, at the GYPA locus Crockett's blood was A–B and the visor spot was A–B, at the HBGG locus Crockett's blood was A–B and the visor spot was A–B, at the D7S8 locus Crockett's blood was B–B and the visor spot was B–B, and at the GC locus Crockett's blood was 18–31 and the visor spot was 18–31; and (c) using D1 S80, Crockett's blood was 18–31 and the visor spot was 18–31. Using population databases for these loci, Keel made calculations of the allele frequency and determined that the combination was common to 1 in 750,000 Caucasians, 1 in 4,200,000 African–Americans, 1 in 2,500,000 Mexican–Americans, and 1 in 1,500,000 Asians.

Keel acknowledged on cross-examination that he had not tested blood samples from either of the Kennedy brothers, so they could not be eliminated as a source of the blood spots. Keel admitted that under current industry guidelines he was not qualified to act in his capacity as technical leader of the laboratory because of his lack of an advanced degree. There was, however, a waiver provision for which he had applied. Keel noted that he was still qualified to do DNA analysis under these guidelines. Keel also acknowledged that his laboratory once had a problem with the water supply used in PCR testing, but it did not occur until months after he had already run the tests in this case. (Exh. 8 at 2–8) [1]

## DISCUSSION

**A. STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence

---

1. Citations to "exh." are to the exhibits constituting the record lodged with the court by the Attorney General, unless otherwise indicated.

on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407–09, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), while the second prong applies to decisions based on factual determinations, *Miller–El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

■ A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412–13, 120 S.Ct. 1495. A state court decision is an "unreasonable application of" Supreme Court authority, falls under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411, 120 S.Ct. 1495. Rather, the application must be "objectively unreasonable" to support granting the writ. *See id.* at 409, 120 S.Ct. 1495.

■ "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller–El*, 537 U.S. at 340, 123 S.Ct. 1029. This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court. *Sumner v. Mata*, 449 U.S. 539, 546–47, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir.2001). A petitioner must present clear and convincing evidence to overcome § 2254(e) (1)'s presumption of correctness; conclusory assertions will not do. *Id.*

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller–El*, 537 U.S. at 340, 123 S.Ct. 1029; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir.2000).

■ When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801–06, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir.2000).

## B. ISSUES PRESENTED

### 1. Conflict of Interest

Petitioner contends that his defense attorney, Bill Fazio, had a conflict of interest because he was considering running or had decided to run for district attorney. The California Court of Appeal rejected this claim, concluding that there was no "actual conflict." (Exh. 8 at 9–12)

Petitioner did not raise this argument at trial. In order to establish a violation of the Sixth Amendment, a petitioner "who

raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) (footnote omitted); *accord Mickens v. Taylor,* 535 U.S. 162, 171, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002). An "actual conflict" is not separate from an "adverse effect;" rather, it is defined as one which adversely affects the lawyer's performance. *Earp v. Ornoski,* 431 F.3d 1158, 1183 (9th Cir.2005) (quoting *Mickens,* 535 U.S. at 172 n. 5, 122 S.Ct. 1237).

In order to establish that a conflict of interest "adversely affected counsel's performance," petitioner must demonstrate that conflict of interest "actually affected" the attorney's performance. *Bragg v. Galaza,* 242 F.3d 1082, 1087 (9th Cir.), *amended,* 253 F.3d 1150 (9th Cir.2001). This showing need not rise to the level of actual prejudice, as it must with an ineffective assistance claim based on counsel's incompetence. *Maiden v. Bunnell,* 35 F.3d 477, 481 (9th Cir.1994).

An adverse effect in the *Cuyler* sense "must be one that significantly worsens counsel's representation of the client before the court or in negotiations with the government." *United States v. Mett,* 65 F.3d 1531, 1535 (9th Cir.1995). A conflict which causes problems of some sort in some facet of the attorney-client relationship (for example, by generating transient feelings of mistrust between attorney and client), but which ultimately has no significant impact on counsel's representation before the court or in negotiations with the government, does not cause an adverse effect in the sense of *Cuyler. Id.* at 1535–36. A petitioner must prove an actual conflict through a factual showing in the record. *Bragg,* 242 F.3d at 1087

■ This is not a difficult claim to resolve, because petitioner simply has not met his burden to show an "actual con-

flict," i.e., some effect on counsel's conduct of the case arising from his putative run for district attorney. He provides nothing but speculation (Pet. at Exh. C).

Because petitioner has not established that his Sixth Amendment rights were violated, the rejection of this claim by the state appellate courts could not have been contrary to, or an unreasonable application of, clearly-established Supreme Court authority.

**2. Confrontation Clause Claim**

This issue originally was issue three in the petition. In the "grounds" section of the form petition, petitioner describes this issue thus: "The judgment must be reversed because it is based on inadmissible hearsay evidence." (Pet.8) The facts he alleges in support are: "Petitioner will be supplementing this claim with argument from direct appeal. (See Exhibit 'D')."

Exhibit D consists of five pages from the petition for review filed in the direct appeal. There counsel raised two distinct issues; one a claim that Emmett's preliminary hearing testimony should not have been admitted because it was hearsay and because its admission violated petitioner's Confrontation Clause rights; and the other that two witnesses' testimony as to what Emmett had said to them was hearsay and should not have been admitted as prior consistent statements.

Because this exhibit contained a Confrontation Clause claim the Court did not dismiss the claim on initial review. As to the second half of this claim, however, there is no federal constitutional claim. Petitioner therefore has not stated a ground for federal habeas relief as to admission of the so-called prior consistent statements. In addition, because the petition for review was the medium by which petitioner presented his claims to the highest state court available, the California

Supreme Court, he has not exhausted any federal claim that might be hypothesized from these facts.

In conclusion, because petitioner does not contend that his federal rights were violated in connection with the prior consistent statements, the Court will not address this issue further. To extent petition intended to present it as a separate claim in this proceeding, it is DISMISSED as presenting only a state-law claim.

Petitioner does contend that his constitutional rights were violated as to admission of Emmett's preliminary hearing testimony. At trial, Emmett invoked his Fifth Amendment rights and refused to testify. The trial court determined that he was "unavailable" and admitted his testimony from the preliminary hearing (Exh. 8 at 12). Petitioner contends that his rights under the Confrontation Clause of the Sixth Amendment were violated by admission the preliminary hearing testimony.

■ Confrontation Clause analysis has been dramatically changed by the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36, 61, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). *Crawford*, however, announced a "new rule" for purposes of *Teague* analysis, and that rule does not come within the exception to the *Teague* non-retroactivity rule for "watershed rules." *Whorton v. Bockting*, —— U.S. ——, ——, 127 S.Ct. 1173, 1184, 167 L.Ed.2d 1 (2007) (applying *Teague v. Lane*, 489 U.S. 288, 310–316, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)). *Crawford* therefore does not apply retroactively on collateral attack. *Id.* Because this case was final before the decision in *Crawford*, pre-*Crawford* law applies.

Before *Crawford*, "[A]n out-of-court statement against a criminal defendant was admissible at trial if two conditions were met. *See* [*Ohio v.*] *Roberts*, 448 U.S. [56,][ ] 65–66[, 100 S.Ct. 2531, 65 L.Ed.2d

597]. First, 'in order to introduce relevant statements at trial, state prosecutors [must] either produce the declarants of those statements as witnesses at trial or demonstrate their unavailability.' [Citations.] Second, even if prosecutors succeed in demonstrating unavailability, the statements are only admissible if they bear 'adequate indicia of reliability.' The 'indicia of reliability' requirement is met if the statement fall within a 'firmly rooted hearsay exception' or contain 'particularized guarantees of trustworthiness.' " *Bockting v. Bayer*, 505 F.3d 973, 978 (9th Cir. 2007).

■ Assertion of the Fifth Amendment privilege against self-incrimination by a witness, thus preventing cross-examination, constitutes unavailability of that witness. *See California v. Green*, 399 U.S. 149, 167, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). Prior preliminary hearing testimony may be deemed reliable for admission if the declarant becomes unavailable to testify. *Id.*

Although petitioner contends that the opportunity to cross-examine at the preliminary hearing was not adequate, as the court of appeal noted the direct examination of Emmett is thirty-seven pages long in the transcript, whereas cross takes up seventy-nine pages, "followed by five pages or redirect and four pages of recross." (Exh. 8 at 13.) Petitioner has failed to show that cross-examination was so limited as not to amount to an opportunity to cross-examine within the meaning of *California v. Green*.

■ In view of *California v. Green*, it is clear that admission of Emmett's preliminary hearing testimony did not violate the Confrontation Clause. Petitioner's rights were not violated.

Because petitioner's confrontation rights were not violated, the state courts' rejec-

tion of this claim was not contrary to, or an unreasonable application of, clearly-established Supreme Court authority.

### 3. Ineffective Assistance of Counsel

Petitioner contends that his counsel was ineffective in his attempts to challenge the DNA evidence.

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must show: first, that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome. *Ibid.* Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689, 104 S.Ct. 2052. A difference of opinion as to trial tactics does not constitute denial of effective assistance. *United States v. Mayo,* 646 F.2d 369, 375 (9th Cir.1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. *Bashor v. Risley,* 730 F.2d 1228, 1241 (9th Cir.1984).

█ Petitioner presents little argument, and no facts, in support of this claim (Pet. Exh. F). As the court of appeal pointed out, however, counsel used the DNA evidence strategically by arguing that the blood spatters, shown to be from the victim by DNA analysis, were in such a pattern in the car as to suggest that the victim was stabbed by the driver (Emmett) rather than petitioner (Exh. 8 at 31–32). In retrospect it may seem that better tactics might have been available, but disagreement with tactical decisions like this does not establish ineffective assistance. *See Bashor,* 730 F.2d at 1241. Given the "strong presumption" in favor of effectiveness, *see Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, petitioner's non-existent showing is not sufficient to prevail on this claim.

Because counsel was not ineffective, the state courts' rejection of this claim was not contrary to, or an unreasonable application of, clearly-established Supreme Court authority.

### CONCLUSION

The petition for a writ of habeas corpus is DENIED. The clerk shall close the file.

**IT IS SO ORDERED.**